[Cite as *Stanley v. Ohio State Univ. Med. Ctr.*, 2013-Ohio-5140.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Alan Stanley, Individually and as     :
Guardian of Maria Stanley, an incompetent,

    :

       Plaintiff-Appellant,

    :          No. 12AP-999

v.                          (Ct. of Cl. No. 2009-08683)

    :

The Ohio State University Medical Center,        (REGULAR CALENDAR)

    :

       Defendant-Appellee.

    :

D E C I S I O N

Rendered on November 21, 2013

*Colley Shroyer & Abraham Co., LPA*, and *David I. Shroyer*, for appellant.

*Kegler*, *Brown*, *Hill & Ritter*, and *Timothy T. Tullis*, for appellee.

APPEAL from the Court of Claims of Ohio.

SADLER, J.

{¶ 1} Plaintiff-appellant, Alan Stanley, individually and as guardian of his wife, Maria Stanley, appeals from a judgment of the Court of Claims of Ohio in favor of defendant-appellee, The Ohio State University Medical Center ("OSUMC" or "appellee").[1] For the reasons that follow, we affirm the judgment of the trial court.

## I. FACTUAL BACKGROUND

{¶ 2} This case entails severe and devastating injuries sustained by Mrs. Stanley after she suffered a head bleed two days following a brain surgery performed on June 16,

---

[1] Though filed in his individual capacity and that as guardian, for ease of discussion, we will refer to Mr. Stanley as appellant, singular.

2008. While the record consists in large part of medical records and medical expert testimony regarding the requisite standards of care, we begin with a brief factual description of the events as they occurred leading up to and including June 18, 2013, with more specific details to be developed throughout our decision.

{¶ 3} Suffering from progressive hearing loss and ringing in her right ear, Mrs. Stanley began treating with Kenneth Parker, M.D., an otolaryngologist, in March 2007. An MRI in June of that year confirmed the presence of an acoustic neuroma. According to the testimony, an acoustic neuroma is a benign, generally slow-growing tumor of the vestibular nerve. Mrs. Stanley was referred to Abraham Jacob, M.D., a neuro-otologist cranial based surgeon.

{¶ 4} According to Dr. Jacob, at the first visit to his office on June 20, 2007, Mrs. Stanley was informed of the three available treatment options, which were: (1) observation with further testing to check on tumor growth, (2) surgery to remove the tumor, or (3) stereotactic radiation surgery, referred to in this case as Gamma Knife radiotherapy. An MRI taken in October 2007 showed no change in tumor size. However, the MRI report of April 29, 2008 showed the tumor had increased in size, and in Dr. Jacob's opinion, the growth was more rapid than expected for such a time frame.

{¶ 5} Mrs. Stanley elected to have the tumor surgically removed, and Dr. Jacob performed the surgery on the morning of June 16, 2008. Surgery was performed with the assistance of a resident, Agnes Oplatek, M.D.[2] At approximately 2:30 p.m. that day, Mrs. Stanley's family was informed that surgery went well, and Mrs. Stanley was transferred to the intensive care unit ("ICU") for monitoring. The following day, Mrs. Stanley was transferred to the main floor of the hospital. Throughout the day of June 17, 2008, Mrs. Stanley complained of headaches with varying pain intensities that were controlled with pain medications. Mrs. Stanley's vital signs and neurological status were reported to be normal.

{¶ 6} According to appellant, Mrs. Stanley did not complain much about head pain on June 16 and 17. Appellant arrived at the hospital between 7:00 and 8:00 a.m. on

---

[2] Since the time of surgery, Dr. Oplatek has married and her last name is now Hurtuk. However, throughout this decision, we will refer to her as Dr. Oplatek.

June 18, 2008 and nothing "seemed to be anything different from the day before." (Tr. 194.) Appellant described that Mrs. Stanley was sitting up and vomiting "quite a bit," and as the morning progressed, she began complaining of head pain. (Tr. 194.)

{¶ 7} The medical records indicate that, at 8:00 a.m. on June 18, Mrs. Stanley complained of nausea and reported her headache pain as a nine on a pain scale of zero to ten. Mrs. Stanley was given medication for both pain and nausea, and at 9:00 a.m., she reported her pain as being a three out of ten. Mrs. Stanley was also reported to be neurologically stable and alert. At 10:30 a.m., Mrs. Stanley reported her headache pain was a ten out of ten, and she was given intravenous morphine. Registered Nurse Jenny Twomley notified Dr. Oplatek of the patient's headache pain and monitored her neurological status. At noon, Mrs. Stanley's neurological status was reported to be normal, and her headache pain had decreased to a three out of ten.

{¶ 8} At 1:00 p.m., Mrs. Stanley reported to Twomley that her headache pain was again a ten out of ten and was the worst pain since surgery; therefore, Twomley notified Dr. Oplatek again. Dr. Oplatek testified that, as a result of this information, she contacted Dr. Jacob and ordered a different pain medication. At 1:30 p.m., it was noted that Mrs. Stanley was sleeping, and at 2:00 p.m., Mrs. Stanley reported her pain was a three out of ten.

{¶ 9} At 2:15 p.m., Mrs. Stanley appeared drowsy, and a neurological examination showed left-side weakness in her grasp. Mrs. Stanley was given Narcan, a medication to reverse the effects of the narcotic pain medications, and a CT scan was ordered. The CT scan and report were completed at 3:25 p.m., and it showed intracranial bleeding and hydrocephalus. Shortly thereafter, Mrs. Stanley became unresponsive and by 4:15 p.m. was intubated and being monitored by neurosurgeon John McGregor, M.D.

{¶ 10} Dr. McGregor performed a ventriculostomy to drain excess spinal fluid from the brain in order to decrease intracranial pressure and conducted a CT angiogram ("CTA") in an attempt to locate the source of the bleed. The CTA having shown no abnormalities, a magnetic resonance venogram ("MRV") was performed and was negative for the presence of any obstructions in the veins. An MRI, however, did show areas of ischemia and dead brain tissue.

{¶ 11} Dr. McGregor recommended a decompression surgery to remove a portion of the skull to allow the brain to expand so as to prevent secondary damage from any swelling.  At approximately 9:45 p.m. that evening, said surgery was successfully performed, but Mrs. Stanley suffered permanent brain damage necessitating that she be cared for on a continuous basis.

## II.  PROCEDURAL BACKGROUND

{¶ 12} This litigation began with the filing of a complaint on November 4, 2009, alleging medical malpractice, hospital negligence, respondeat superior, agency by estoppel, and loss of consortium.  The asserted claims arose from the June 16, 2008 medical procedure performed on Mrs. Stanley at OSUMC.  According to the complaint and accompanying affidavit of merit, Mrs. Stanley's injuries were caused by a breach of the standard of care rendered by the doctors and nurses at OSUMC.  Discovery ensued, and on December 28, 2011, appellant filed a motion to amend the complaint in order to add a claim for lack of informed consent.  Over objection by appellee, appellant's motion to amend the complaint was granted.

{¶ 13} Trial on the issue of liability commenced on January 30, 2012 and continued until February 3, 2012, at which time the parties agreed that the remainder of the liability trial would continue on March 28, 2012.  On February 2, 2012, appellee filed a motion, pursuant to Civ.R. 41(B)(2), seeking an involuntary dismissal of appellant's claim for lack of informed consent.  The parties briefed the issue, and on April 2, 2012, the trial court granted appellee's motion to dismiss the claim for lack of informed consent.

{¶ 14} Trial proceeded and at the conclusion of the trial on March 30, 2012, the parties were instructed to file post-trial briefs.  Thereafter, the trial court issued a 15-page decision concluding appellant failed to prove either that treatment rendered by appellee's nursing staff fell below the standard of care or that the timing of the surgery on June 18, 2008 was a deviation from the standard of care.  Further, the court found appellee's medical staff properly assessed Mrs. Stanley's condition and that the appropriate tests were ordered to detect the source of the head bleed before performing the decompression surgery.  After concluding appellant's negligence claim failed, the trial court found appellant's loss of consortium claim failed as well.  Judgment for appellee was entered accordingly.

## III.  ASSIGNMENTS OF ERROR

{¶ 15}  Appellant has filed an appeal from the trial court's judgment and asserts the following ten assignments of error for our review:

> [I.]  The trial court erred in rendering a verdict that was against the manifest weight of the evidence, and the findings of fact and testimony were flawed, requiring a reversal.
>
> [II.]  The trial court erred in failing to rule in appellants' favor on Dr. Oplatek/Hurtuk's violation of the standard of care.
>
> [III.] The trial court erred in allowing defense witnesses to testify outside the scope of their reports and depositions, in violation of court of claims Loc.R. 7(E) and the court's own instructions to the parties.
>
> [IV.]  The trial court erred in refusing to require appellee to provide the supplemental reports of its expert, Dr. Saris.
>
> [V.]  The trial court erred in excluding testimony of family members about the severity of [Mrs. Stanley's] head pain and the opinion that this was the worst headache of her life.
>
> [VI.]  The trial court erred in excluding discovery depositions of defendant physicians McGregor and Oplatek/Hurtuk.
>
> [VII.] The trial court erred in having judicial bias and in failing to consider all the facts.
>
> [VIII.] The trial court erred in granting appellee's motion to dismiss appellants' claim of lack of informed consent, improperly excluded family testimony about [Mrs. Stanley's] lack of information that would have allowed her to make an informed decision, and improperly excluded cross-examination of a defense expert on this issue.
>
> [IX.]  The trial court erred in refusing appellants access to the video of the trial.
>
> [X.]  The cumulative effect of all of the above errors denied appellants a fair trial and due process of law.

## IV. DISCUSSION

### A. First Assignment of Error

{¶ 16} In his first assignment of error, appellant contends the trial court's decision rendering judgment in favor of appellee on the issue of liability was against the manifest weight of the evidence.

{¶ 17} Civil "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. "[A]n appellate court should not substitute its judgment for that of the trial court when there exists * * * competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial judge." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984); *see also Myers v. Garson*, 66 Ohio St.3d 610, 616 (1993) (reaffirming the reasoning of *Seasons Coal Co.* and "hold[ing] that an appellate court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial court").

{¶ 18} When considering whether a civil judgment is against the manifest weight of the evidence, an appellate court is guided by a presumption that the findings of the trier of fact were correct. *Seasons Coal Co.* at 79-80. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.* at 80.

{¶ 19} In order to establish medical malpractice, a plaintiff must show: (1) the standard of care recognized by the medical community, (2) the failure of the defendant to meet the requisite standard of care, and (3) a direct causal connection between the medically negligent act and the injury sustained. *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130 (1976). Ordinarily, the appropriate standard of care must be demonstrated by expert testimony. *Id.* That expert testimony must explain what a physician of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances. *Id.*

{¶ 20} In *Bruni*, the Supreme Court of Ohio established the legal standard for medical malpractice as follows:

> In evaluating the conduct of a physician and surgeon charged with malpractice, the test is whether the physician, in the performance of his service, either did some particular thing or things that physicians and surgeons, in that medical community, of ordinary skill, care and diligence would not have done under the same or similar circumstances, or failed or omitted to do some particular thing or things which physicians and surgeons of ordinary skill, care and diligence would have done under the same or similar circumstances. He is required to exercise the average degree of skill, care and diligence exercised by members of the same medical specialty community in similar situations.

*Id.* at 129-30.

{¶ 21} According to Dr. Jacob, the surgery performed on Mrs. Stanley begins with an incision made behind the ear and the ear being laid forward. This is followed by "three to four hours" of drilling the skull bone away to get to the sack that houses the brain, the dura. (Tr. 262.) An incision is then made in the dura, and, once the tumor is located, it is dissected off of the nerve. After that process is completed, a fat graft is taken from the patient's belly and placed into the craniotomy defect and the closure process begins.

{¶ 22} A risk of this surgical procedure is an intracranial bleed, or head bleed, which is the reason these post-surgery patients are admitted overnight to ICU for observation. While in the ICU, these patients get neurological checks every hour. Once transferred to the main floor of the hospital, neurological checks are performed every four hours.

{¶ 23} According to Dr. Jacob, it is customary for patients that have undergone such a procedure to experience severe postoperative headaches, many reported as "10 out of 10, some say 12-out-of-10" headaches. (Tr. 305.) Dr. Jacob testified that postoperative headaches, in the absence of neurological changes or vital sign changes, should be treated with pain medication to alleviate the pain and suffering the patient is experiencing. Testimony given at trial also indicated symptoms of a head bleed include pain that does not respond to medication, vision problems, slurred words, and altered breathing patterns, as well as decreased levels of consciousness.

{¶ 24} Mrs. Stanley experienced a head bleed two days after her surgery. It is appellant's theory that the doctors at OSUMC failed to correctly diagnose the specific type of head bleed Mrs. Stanley was experiencing, which led to a delay in the proper course of treatment. According to appellant, had appropriate treatment been given to treat the specific type of head bleed that occurred, Mrs. Stanley would have experienced a better outcome.

{¶ 25} The two specific types of head bleeds at issue in this case are subdural bleeds and subarachnoid bleeds, each involving a different bleeding source and a different course of treatment. In a subdural bleed, blood spills into the subdural space and is contained outside of the lining that covers the brain. The blood in a subdural bleed is more likely to be localized and results in pressure on the brain, which causes ischemia and can lead to infarction or permanent injury.

{¶ 26} In a subarachnoid bleed, blood spills within the brain covering and results in blood being mixed with cerebrospinal fluid ("CSF"). Thus, blood in the subarachnoid space will flow over the surface of the brain and actually come into contact with brain tissue. This can cause vasospasm, the narrowing of blood vessels, which results in less blood flow to the brain and can result in ischemic injury and ultimately infarction. Though these two types of bleeds can result in similar pain and neurological changes, there is typically not an immediate need to perform a surgical intervention with subarachnoid bleeds as there is with subdural bleeds.

{¶ 27} In the opinion of Stephen M. Bloomfield, M.D., the CT scan taken at 3:25 p.m. on June 18 showed "evidence of blood in the subdural space on both sides of the brain stem, and the brain stem being pushed out of normal position because of the pressure exerted from that blood." (Tr. 442.) In Dr. Bloomfield's opinion, even though the 3:25 p.m. CT scan showed "primarily subdural [blood] with a little bit of subarachnoid hemorrhage," it would be below the standard of care for a doctor to conclude only subarachnoid blood was shown in the 3:25 p.m. CT scan. (Tr. 451.) Dr. Bloomfield testified the conditions shown in the CT scan required immediate surgical intervention, and, thus, Dr. McGregor fell below the requisite standard of care by failing to take Mrs. Stanley to surgery at that time.

{¶ 28} Neuroradiologist Michelle Hansman Whiteman, M.D., agreed with Dr. Bloomfield and testified the 3:25 p.m. CT scan showed a subdural bleed. Dr. Whiteman did acknowledge, however, that the CT scan showed subdural blood and also "some degree of subarachnoid blood." (Tr. 662-63.) On cross-examination, Dr. Whiteman made reference that "there also was significant subarachnoid hemorrhage." (Tr. 708.)

{¶ 29} Neuroradiologist Michael Lipton, M.D., Ph.D., testified that, with respect to the CT scan, "it shows extensive intracranial bleeding, which is a combination of subarachnoid and subdural blood that is exerting pressure on some of the brain structure * * * and that that blood is in locations which are intimately associated with very important vascular and nerve structures that make it not possible for it to be safely accessed for removal." (Tr. 778.) Dr. Lipton also opined the CT scan showed subtle areas of abnormality indicating the presence of irreversible ischemic injury in the cerebellum and the brain stem.

{¶ 30} Neuro-otologist Kevin Brown, M.D., Ph.D., testified that had Mrs. Stanley's head bleed occurred at 10:30 a.m., as Dr. Bloomfield opined, he would not expect a normal neurological exam one and one-half hours later, nor would he expect her to have responded to pain medication and for her pain level to be reported as a three out of ten at 12:00 p.m. In Dr. Brown's opinion, there was not a deviation in the standard of care by not ordering a CT scan at 10:35 a.m. because Mrs. Stanley's neurological status remained normal. Additionally, Dr. Brown was not critical of Dr. Oplatek's decision to not order a CT scan at 1:00 p.m. because, although Mrs. Stanley reported ten out of ten pain at this time, there was no change in her neurological status. According to Dr. Brown, the first noted documented change in neurological status occurred at 2:15 p.m., and Dr. Oplatek's response of ordering Narcan and a stat CT scan at that time was appropriate. In summary, Dr. Brown opined that Dr. Jacob, Dr. Oplatek, and the other physicians caring for Mrs. Stanley comported with the requisite standard of care.

{¶ 31} Neurosurgeon Stephen Saris, M.D., testified severe headaches are common after a procedure such as that performed on Mrs. Stanley. According to Dr. Saris, the CT scan from June 18 showed three things, an extensive head bleed resulting in blood in both the subdural and subarachnoid areas of the brain, infarction of part of the brain stem and part of the cerebellum, and acute hydrocephalus. In Dr. Saris's opinion, it made no

difference whether surgery was performed at 3:45 p.m. or 9:45 p.m. because part of the brain had an infarction at 3:25 p.m. Additionally, Dr. Saris opined the tests performed after the CT scan were reasonable and that taking Mrs. Stanley immediately to surgery prior to those tests "would have been very poor medical judgment." (Tr. 1374.)

{¶ 32} Dr. Oplatek testified various spectrums of headaches, including ten out of ten headaches, are common after this type of surgery; therefore, because her vital signs and neurological status were stable, Dr. Oplatek opined Mrs. Stanley's head pain documented at 10:35 a.m. and 1:00 p.m. was routine postoperative head pain that did not warrant a CT scan. Thinking perhaps the head dressing was too tight, Dr. Oplatek told the nurse she would be there at approximately 3:00 p.m. to check the dressing. Dr. Oplatek testified she was first made aware that Mrs. Stanley had symptoms of a potential head bleed when Mrs. Stanley exhibited signs of neurological change, at which time Dr. Oplatek ordered Narcan, a stat CT scan, and notified Dr. Jacob. By the time Dr. Oplatek reached the hospital, the CT scan was complete and reported that a head bleed had occurred. Additionally, Mrs. Stanley had been intubated and an emergency neurosurgical consultation had been placed.

{¶ 33} Dr. McGregor testified the CT scan showed that a head bleed had occurred, and there was blood in both the subdural and subarachnoid spaces. However, most of the blood was around the brain stem, which is an area not accessible to surgery. According to Dr. McGregor, the goal at that point in time became to prevent secondary injury from another bleed. In Dr. McGregor's opinion, the ventriculostomy performed after the CT scan was appropriate to relieve pressure from the subsequent production of CSF. Once the ventriculostomy was placed, Dr. McGregor testified the next two issues to resolve were where the bleed originated and whether or not it was likely to bleed again in the next 24 hours. Therefore, the CTA was performed.

{¶ 34} Dr. McGregor also testified that because the CTA did not show any abnormal blood vessels, an MRV was performed. The MRV was normal and did not show any thrombosis or occlusion of a vein. An MRI of the brain was also performed to determine which areas of the brain were ischemic or had infarct. The MRI showed infarct on the brain, or dead brain tissue. According to Dr. McGregor, at this point in time, he knew there was infarct, but no abnormal blood vessel was going to erupt "immediately or

in the next several hours or next 24 hours."  (Tr. 1686.)  Knowing that further swelling of the brain was likely due to the infarct, Dr. McGregor recommended surgery to remove more of the skull bone to allow the cerebellum room to expand.

{¶ 35} Dr. McGregor disagreed with Dr. Bloomfield's opinion that the standard of care required that surgery should have been completed prior to 9:45 p.m. and testified that "[t]o consider moving the surgery time up without any of the test information that we had potentially could have been fool-hearted, because if we would have had an abnormal blood vessel, it could have opened up while we were operating, and it could have bled from a place that you can't get to * * * in which case then she would potentially not survive the operation."  (Tr. 1689.)

{¶ 36} Twomley, the staff nurse assigned to Mrs. Stanley from 7:00 a.m. to 3:00 p.m. on June 17 and 18, testified the signs and symptoms that may cause one to suspect a head bleed are change in consciousness level, confusion, weakness, and slurred speech. Because patients recovering from acoustic neuroma removal surgery experience intense headaches, such headaches alone are not enough for one to suspect a head bleed is occurring.

{¶ 37} According to Twomley, on June 17, Mrs. Stanley reported headaches of varying intensities, and on June 18, Twomley first assessed Mrs. Stanley between 7:30 and 8:00 a.m.  During that time frame, Mrs. Stanley's vital signs and neurological assessment were normal; however, she was given medication for nausea and reported head pain of a nine out of ten.  At 9:00 a.m., Mrs. Stanley was still reporting nausea, but reported her pain level had decreased to a three.  Twomley testified Mrs. Stanley was responding appropriately to questions and, in essence, this also allowed Twomley to assess Mrs. Stanley's neurological status.  At 10:00 a.m., Mrs. Stanley's pain was a three, her nausea had resolved, and she was alert, oriented, and responding appropriately to Twomley.  At 10:35 a.m., Mrs. Stanley reported a pain level of a ten and was given intravenous morphine.  Twomley testified she called to notify Dr. Oplatek of the pain level, and, though having no specific recollection of the conversation, Twomley testified her standard practice is to report vital signs and any neurological concerns.  Therefore, Twomley testified she would have let Dr. Oplatek know that Mrs. Stanley's neurological checks and vital signs were normal.

{¶ 38} The medical reports indicated that, at 11:00 a.m., Mrs. Stanley used the bathroom, which, according to Twomley, would entail someone helping her get out of bed and walking her to the bathroom. Mrs. Stanley's blood glucose levels were checked at 11:15 a.m., and, based on the results of the test, Twomley gave Mrs. Stanley an insulin injection at 11:35 a.m. Twomley testified that she was assessing Mrs. Stanley during these interactions and that if she had observed Mrs. Stanley "screaming or moaning or writhing in pain" when she administered the insulin, she would have notified the doctor and "probably wouldn't have administered her insulin at that time." (Tr. 1506.)

{¶ 39} At 11:55 a.m., Twomley gave Mrs. Stanley pain medication, and the 12:00 p.m. records indicate the neurological checks were normal at that time. At 1:00 p.m., the records indicate that Mrs. Stanley reported "pain 10 out of 10, worst pain," that Dr. Oplatek was aware and pain medication would be given, that Mrs. Stanley would continue to be monitored, and a doctor would be in to change the head dressing. (Tr. 1514.) According to Twomley, she asked Mrs. Stanley about her pain and Mrs. Stanley reported it was the worst pain since surgery.

{¶ 40} Twomley testified that when she called Dr. Oplatek around 1:00 p.m., Dr. Oplatek said she was "at clinic" and would be in around 3:00 p.m. to change the head dressing. Twomley asked if another doctor was available "[b]ecause if the dressing was causing her pain and making her uncomfortable, I wanted someone to come and change it now if they were available." (Tr. 1517.) According to Twomley, she did not suspect a head bleed, and if she wanted a doctor at the bedside immediately, she would have been able to do that.

{¶ 41} At 1:30 p.m., Twomley reported Mrs. Stanley was sleeping and "looked comfortable." (Tr. 1520.) At 2:00 p.m., Mrs. Stanley reported a pain level of three and "was alert." (Tr. 1520.) At 2:15 p.m., Twomley went in to give Mrs. Stanley some medication and she "seemed very drowsy." (Tr. 1522.) This prompted Twomley to perform an unscheduled neurological check, and, at this time, she noticed left-sided weakness. Therefore, Twomley paged Dr. Oplatek. After speaking with Dr. Oplatek, the plan was to give Mrs. Stanley Narcan and take her for a stat head CT scan, and those orders were carried out "[i]mmediately." (Tr. 1524.)

{¶ 42} Twomley testified that she remembers seeing Mrs. Stanley crying on June 18, but she could not recall the exact time frame. Twomley testified she frequently sees patients cry and that such will not always be documented in the medical records because it depends on the circumstances and "what is going on with the patient at the time." (Tr. 1502.) Twomley did not recall any "screaming, writhing, or moaning in pain," nor did anyone in Mrs. Stanley's family report such actions on behalf of Mrs. Stanley. (Tr. 1527.)

{¶ 43} Melissa Ann Popovich possesses a doctorate of nursing practice and was critical of the nurses' care of Mrs. Stanley up until 2:15 p.m. on June 18. According to Popovich, the standard of care requires a nurse with a postoperative brain surgery patient complaining of a ten out of ten headache to contact the doctor. Popovich also opined the standard of care required that neurological checks should have been completed at 9:00 a.m. and 10:35 a.m. on June 18. In Popovich's opinion, Twomley breached the standard of care by failing to document properly as she failed to document the patient was crying, failed to document the appropriate time of events, and failed to document additional patient assessment information. Popovich testified, "[i]t is a current standard of practice within nursing that if it's not documented, it's not done." (Tr. 1112.)

{¶ 44} Popovich opined that when the "worst pain" was charted, the nurse should call the doctor, report the pain level, do further assessments, and request that the doctor come to see the patient. Additionally, Popovich testified that, at 1:30 p.m., the nurse should have gone into the room to wake Mrs. Stanley to assess her and that it is not an acceptable standard of care for the nurse to simply "chart patient sleeping." (Tr. 1114.) Popovich also opined the delay between the first page to Dr. Oplatek at 2:15 p.m. and the administering of the Narcan at 2:50 p.m. was not acceptable. On cross-examination, Popovich admitted she has never been responsible for the postoperative nursing care of an acoustic neuroma patient and that beginning at 2:15 p.m., the nurses did everything "they should be doing." (Tr. 1161.)

{¶ 45} Registered Nurse Jenny Beerman testified as an expert witness regarding appellant's claim that appellee's nursing staff practiced below the requisite standard of care. Beerman opined the nurses involved met the standard of care and that, in her opinion, when caring for postoperative brain surgery patients, a ten out of ten headache

alone does not require that a nurse suspect a head bleed or that a nurse contact the doctor. According to Beerman, the nursing staff acted appropriately in their care of Mrs. Stanley, up to and including 2:15 p.m. when the neurological changes were first documented.

{¶ 46} Mrs. Stanley's family offered testimony pertaining to the events that occurred on June 18, and their testimony differs with respect to the pain being reported by Mrs. Stanley. Appellant testified that, in the "later hours of the morning of the 18th," Mrs. Stanley was in "extreme pain * * * turning red and sweating and shaking and she couldn't talk right. She was crying." (Tr. 195-96.) Appellant testified that Mrs. Stanley did not respond to the morphine she was given that morning, but, instead, complained more of pain, was crying and very upset, and wanted appellant to do something. Mrs. Stanley's mother and two daughters testified that when they talked to appellant around 12:00 p.m. on June 18, they could hear Mrs. Stanley moaning in pain and screaming. Mrs. Stanley's daughter, Amy Spridgeon, described it as "screaming, calling out my dad's name to help her." (Tr. 116.) Mrs. Stanley's mother, Pauline Kesterson, described it as "screaming, I mean loud screams." (Tr. 155.) Mrs. Stanley's daughter, Krissie Stanley, described it as "moaning in pain. She was kind of screaming or moaning like." (Tr. 219.)

{¶ 47} On appeal, appellant challenges the trial court's judgment as being against the manifest weight of the evidence. Under this assigned error, appellant asserts the head bleed occurred at 1:00 p.m., and appellee's employees and agents misidentified Mrs. Stanley's head bleed as a subarachnoid bleed, therefore delaying her surgery in a manner that caused her injury.

{¶ 48} In support of his position, appellant directs this court to areas of Dr. McGregor's and Dr. Oplatek's trial testimonies wherein his counsel attempted to impeach the doctors with their prior deposition testimonies. In essence, appellant argues the trial court could not have found these witnesses credible. Credibility of witnesses and the weight to be given to their testimony are primarily questions for the trier of fact, and this court typically does not find reversal in the trial court's resolution of credibility issues. *Ashcraft v. Univ. of Cincinnati Hosp.*, 10th Dist. No. 02AP-1353, 2003-Ohio-6349, ¶ 59, *appeal not allowed*, 102 Ohio St.3d 1423, 2004-Ohio-2003; *Seasons Coal Co.*

{¶ 49} Appellant also asserts the trial court's judgment is against the manifest weight of the evidence because of reliance on evidence that should not have been admitted and/or because of evidence the trial court did not admit. These evidentiary matters have been raised as separate assignments of error and will be discussed accordingly in this decision.

{¶ 50} Appellant challenges the trial court's decision as being incomplete and argues the trial court ignored facts, ignored testimony, failed to explain its reasoning for relying on certain evidence, failed to acknowledge certain portions of testimonies, failed to comment on Dr. Brown "lying in the courtroom," and misunderstood Dr. McGregor's testimony. (Appellant's Brief, 33.) We note this matter presents a voluminous record, made up of over 1800 pages of trial transcript, multiple depositions, and binders of exhibits consisting of medical records and reports. In a 15-page decision, the trial court set forth the evidence upon which it relied to render its decision, and there is no duty upon the trial court to comment on each item of evidence. *Paquette v. Paquette*, 10th Dist. No. 84AP-1142 (Aug. 6, 1985). Moreover, a reviewing court presumes regularity of the proceedings below where the record does not affirmatively demonstrate error. *Id.*, citing *Ostrander v. Parker-Fallis*, 29 Ohio St.2d 72 (1972). In this case, the record indicates that *all the evidence* was reviewed. Given this indication, coupled with the presumption of regularity of the proceedings, we find no demonstration that the trial court ignored evidence or that any error occurred in the trial court's failure to acknowledge certain portions of testimonies, as set forth by appellant. Regarding appellant's assertion that the trial court misunderstood the expert testimony, such contention will be reviewed in our final disposition of this assigned error.

{¶ 51} This record presents a heartbreaking factual scenario in which an initially successful brain surgery was performed only to have devastating injuries arise two days after surgery. While the record reveals a voluminous amount of evidence, the issue narrows to one in which the trier of fact was asked to determine whether or not the standard of care required that a CT scan occur earlier in the day of June 18.

{¶ 52} There appears to be little dispute that the medical records and testimony from the medical personnel indicate no neurological changes were documented until 2:15 p.m. on June 18. Further, there is expert testimony that, in a patient such as Mrs. Stanley,

a ten out of ten headache alone is not enough to warrant a CT scan. There is also expert testimony that such a headache, either alone or coupled with the family members' description of Mrs. Stanley, does require a CT scan.

{¶ 53} The trial court, acting as trier of fact in this case, determined Twomley notified Dr. Oplatek of Mrs. Stanley's status, including her vital signs and neurological condition at approximately 1:00 p.m. The trial court also determined appropriate action was taken when Mrs. Stanley first exhibited a change in condition of her neurological status at approximately 2:15 p.m. The trial court also outlined the family member's testimony that Mrs. Stanley was crying and screaming in pain at approximately 11:55 a.m.—the same time Twomley testified she was interacting with Mrs. Stanley and did not observe such behavior. Additionally, the trial court outlined the testimony of the expert witnesses and set forth their competing opinions in this matter regarding whether or not there was a breach of the standard of care in this case.

{¶ 54} In determining that appellant failed to establish such a breach, the trial court rejected Dr. Bloomfield's opinion that the head bleed occurred shortly before 10:35 a.m. Additionally, the trial court expressly found Beerman's testimony more credible and persuasive than Popovich's testimony. The trial court also determined there was no merit to appellant's argument that Mrs. Stanley's surgery was delayed based upon a misunderstanding regarding the location of the head bleed or, in other words, that appellee's physicians misdiagnosed Mrs. Stanley's head bleed. In sum, the trial court concluded appellant failed to prove either that treatment rendered by appellee's nursing staff fell below the standard of care or that the timing of Dr. McGregor's surgery was a deviation from the standard of care. The trial court further found appellee's "medical staff properly assessed [Mrs. Stanley's] condition." (Decision, 15.)

{¶ 55} Upon review of the entire record, we cannot conclude that the trial court's decision is against the manifest weight of the evidence. As shown, competing opinions were provided. "[A]n appellate court should not substitute its judgment for that of the trial court when there exists * * * competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial judge." *Seasons Coal Co.* at 80. We recognize the extensive cross-examination undertaken by both counsel, but cannot conclude that such rendered the expert opinions in this case to be either not

credible or not competent so as to conclude a reversal, based on the weight of the evidence, is required.

{¶ 56} Appellant also asserts the trial court failed to provide a ruling on the conduct of Dr. Oplatek. At oral argument, appellant's counsel repeatedly referred to Dr. Oplatek's alleged negligent conduct as "the strongest part" of their case for which they did not obtain a ruling from the trial court. Initially, we note appellant's introduction in his 64-page post-trial brief to the trial court states:

> This is not a case about whether the staff at OSUMC acted quickly enough to respond to an emergency once the CT results had became [sic] known. Rather, the staff was never called upon to act with urgency because the CT scan was misinterpreted and misunderstood[.] * * * After Dr. McGregor saw the MRI, he consulted a [sic] obtained consent for surgery at 9:25 PM. [Mrs. Stanley] was in surgery within 30 minutes to decompress her brain. It saved her life, but because she suffered the effects of compression for over 6.5 hours with worsening symptoms over that period of time, she suffered irreparable brain damage.

(Appellant's Post-Trial Brief, 6-7.)

{¶ 57} Thereafter, Dr. Oplatek's alleged negligent conduct at 1:00 p.m. was mentioned on pages 11, 43-48, and 52-55, and included a combined discussion of Dr. Oplatek's conduct as well as the alleged negligent conduct of the nursing staff. The majority of appellant's post-trial brief is devoted to a discussion of Dr. McGregor's conduct in not performing surgery on June 18 until 9:45 p.m. and to discrediting the expert testimony provided by appellee. Thus, in our view, the trial court's focus on Dr. McGregor was in response to the arguments set forth by counsel in the post-trial brief, which also focused primarily on Dr. McGregor.

{¶ 58} Secondly, this case does not contain individually named defendants, as the only named defendant is OSUMC. The trial court discussed Dr. Oplatek's role in this case, including her testimony regarding her actions in the 1:00 p.m. time frame, and in its conclusion, found that appellant failed to establish a breach of the standard of care by appellee's "medical staff." Hence, we are not presented with a scenario in which it can be said the trial court was not aware of, or forgot, to assess a party's conduct. Moreover, the trial court noted the witnesses' testimonies indicating that a severe headache alone,

without a change of neurological status or vital signs, is not necessarily indicative of a head bleed for a postoperative brain surgery patient like Mrs. Stanley and does not warrant performing a CT scan. The trial court also expressly found Beerman credible in her testimony that, prior to 2:15 p.m., there was no cause for Twomley to suspect Mrs. Stanley was suffering from a head bleed. Inherent in these findings is a conclusion that Dr. Oplatek was not negligent in not suspecting a head bleed or not ordering a CT scan prior to this time. Accordingly, we conclude that the trial court's discussion of Dr. Oplatek and reference to appellee's "medical staff" adequately encompassed the conduct of Dr. Oplatek such that reversal on manifest weight grounds is not required.

{¶ 59} For the foregoing reasons, we conclude the trial court's judgment is not against the manifest weight of the evidence and overrule appellant's first assignment of error.

### B. Second Assignment of Error

{¶ 60} In the second assignment of error, appellant contends the trial court erred in failing to rule in favor of appellant with respect to his claim asserting Dr. Oplatek fell below the requisite standard of care.

{¶ 61} According to appellant, Dr. Oplatek testified at her deposition that if she had known Mrs. Stanley was characterizing her head pain as the worst headache of her life, Dr. Oplatek would have ordered a CT scan at that time. Because the trial court concluded Twomley discharged her duties by informing Dr. Oplatek at 1:00 p.m. that Mrs. Stanley had experienced the "worst headache," appellant argues the trial court erred in failing to find Dr. Oplatek fell below the standard of care by not having Mrs. Stanley evaluated by a physician or ordering a CT scan at that time.

{¶ 62} The flaw in appellant's argument is that he relies upon what we discern to be a mischaracterization of the testimony. Twomley testified that she did not observe Mrs. Stanley screaming, moaning or writhing in pain, nor were such actions reported to her. Twomley further testified that at 1:00 p.m. on June 18, Mrs. Stanley complained of "pain 10 out of 10, worst pain. Dr. Oplatek aware." (Tr. 1514.) When asked what was meant by "worst pain," Twomley stated, "I discussed with Ms. Stanley her pain being a 10 out of 10, and asked her if it had been the worst pain that she's ever had, or the worst pain since, and she told me the worst pain since surgery." (Tr. 1515.) Twomley notified Dr.

Oplatek of this, and Dr. Oplatek ordered more pain medication.  Though unable to recall if she specifically relayed Mrs. Stanley's vital signs and neurological status at that time, Twomley testified her standard practice is to do so.

{¶ 63} Contrary to appellant's assertion that Twomley informed Dr. Oplatek that Mrs. Stanley was experiencing the worst headache of her life, Twomley's testimony reveals that Mrs. Stanley reported the "worst pain since surgery."  Such testimony represents a subtle but important distinction in this case, and the trial court was entitled to find Twomley credible as to this issue.  Additionally, as set forth in our disposition of appellant's first assignment of error, there was expert testimony that a severe headache alone is not enough in a postoperative brain surgery patient to warrant suspicion of a head bleed or a CT scan.  For these reasons, we conclude the trial court's factual finding that Twomley informed Dr. Oplatek at 1:00 p.m. on June 18 that Mrs. Stanley was experiencing the "worst headache" does not, as appellant suggests, necessarily result in a finding that Dr. Oplatek fell below the standard of care for not ordering a CT scan or physician evaluation at that time.

{¶ 64} Accordingly, we overrule appellant's second assignment of error.

### C.  Third Assignment of Error

{¶ 65} In the third assignment of error, appellant contends the trial court erred in permitting appellee's experts, Drs. Saris and Lipton, to offer opinions beyond those expressed in their expert reports.  The law is well-settled that we review evidentiary matters with an abuse-of-discretion standard.  *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084 (" '[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court' "), quoting *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus; *State v. Swann*, 171 Ohio App.3d 304, 2007-Ohio-2010, ¶ 41 (10th Dist.).  An abuse of discretion is more than an error of law or judgment; rather, it implies that the trial court's attitude was unreasonable, arbitrary or unconscionable, or that there was "no sound reasoning process" to support the trial court's ruling.  *See, e.g.*, *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990); *see also Pilz v. Dept. of Rehab. & Corr.*, 10th Dist. No. 04AP-240, 2004-Ohio-4040, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 66} Appellant asserts the opinions expressed in Dr. Saris's report were limited to whether a CT scan should have been done earlier in the day of June 18 and whether there was an excessive period of time between the diagnosis of the intracranial hemorrhage and surgery. Because Dr. Saris's written report was limited to these two issues, appellant argues Dr. Saris's trial testimony, that Mrs. Stanley suffered irreparable neurological damage at or near the time of the initial bleed, went beyond the opinions expressed in his report. In other words, appellant suggests that at trial Dr. Saris rendered an opinion pertaining to proximate cause, while the opinions in his written report pertained only to whether there was a breach of the standard of care.

{¶ 67} According to appellant, this was in violation of Court of Claims Loc.R. 7(E), which provides, in relevant part:

> A party may not call an expert witness to testify unless a written report has been procured from said witness. It is the trial attorney's responsibility to take reasonable measures, including the procurement of supplemental reports, to insure that each such report adequately sets forth the expert's opinion. However, unless good cause is shown, all supplemental reports must be supplied no later than thirty days prior to trial. The report of an expert must reflect his opinions as to each issue on which the expert will testify. An expert will not be permitted to testify or provide opinions on issues not raised in his report.

{¶ 68} "L.C.C.R. 7(E) requires trial attorneys to exchange written reports of the expert witnesses they intend to call to testify at trial. An expert's report must reflect the expert's opinions as to each issue on which the expert will testify at trial, and the reports must be supplemented as necessary to insure that they comply with this requirement." *McMullen v. Ohio State Univ. Hosp.*, 10th Dist. No. 97API10-1301 (Sept. 22, 1998), *rev'd on other grounds*, 88 Ohio St.3d 332 (2000).

{¶ 69} The trial court allowed Dr. Saris's trial testimony after concluding it did not contain opinions beyond those expressed in the written report, but, rather, contained an explanation of and was "part of how he arrived at those opinions he has." (Tr. 1360.) In addition to the two issues set forth above by appellant, Dr. Saris's report states, "[t]he question is whether these [tests] were indicated, and whether they caused a delay in her surgery that resulted in her poor outcome." (Report, 5.) Thereafter, Dr. Saris's report

indicates that, in his opinion, the medical care decisions rendered on June 18 were appropriate and within the standard of care.

{¶ 70} During trial, Dr. Saris testified to what he believed the June 18 CT scan showed. According to Dr. Saris, the CT scan showed: (1) an extensive intracranial hemorrhage, (2) infarction of part of the brain stem and part of the cerebellum, and (3) a medical condition called acute hydrocephalus. (Tr. 1361.) Dr. Saris explained that, because infarction was present on the 3:20 p.m. CT scan, the fact that surgery was not done until 9:45 p.m. did not necessarily affect the patient's outcome. Thus, Dr. Saris's trial testimony that part of the brain showed infarct provided an additional basis for the ultimate conclusions made in his written report, i.e., that the diagnosis and treatment of Mrs. Stanley's hemorrhage by Dr. Oplatek, Dr. McGregor, and the staff at OSUMC was performed in a timely manner and well within the standard of care.

{¶ 71} Because the trial court, in its discretion, could have concluded Dr. Saris's report encompassed the testimony given at trial, we cannot find that the trial court abused its discretion in allowing Dr. Saris's challenged testimony.

{¶ 72} Under this assigned error, appellant also asserts, in a conclusory fashion, that the trial court erred in allowing Dr. Lipton to render a "new opinion" at trial. Appellant does not provide this court with specific citation to or explanation of the "new opinion" expressed by Dr. Lipton that allegedly fell outside those reflected in his report. Instead, appellant generally cites to six pages of transcript for examples of Dr. Lipton's alleged prohibited testimony. "[T]he burden of affirmatively demonstrating error on appeal rests with the party asserting error." *State ex rel. Petro v. Gold*, 166 Ohio App.3d 371, 2006-Ohio-943, ¶ 94 (10th Dist.). "It is not the duty of [an appellate] court to search the record for evidence to support an appellant's argument as to alleged error." *Id.*

{¶ 73} Regardless, our review of the report contained within the record and the trial testimony given by Dr. Lipton does not reveal any "new opinions." Rather, like the testimony of Dr. Saris, Dr. Lipton's testimony contains an explanation of how he reached the conclusions he did in this case, and the testimony is encompassed within the written report. Therefore, we cannot find that the trial court abused its discretion in allowing Dr. Lipton's challenged testimony.

{¶ 74} Accordingly, we overrule appellant's third assignment of error.

### D.  Fourth Assignment of Error

{¶ 75} In the fourth assignment of error, appellant argues the trial court erred in refusing to require appellee to provide the supplemental reports of Dr. Saris.  Under this assigned error, appellant contends "there allegedly were supplemental reports prepared by Dr. Saris that Appellee did not produce" to appellant.  (Appellant's Brief, 59.)  The record, however, does not establish the existence of any supplemental expert reports rendered by Dr. Saris.  According to the record, Dr. Saris stated that, in addition to the expert report he submitted to appellee's counsel, he prepared "notes."  Appellee's counsel stated, "I'm not sure I ever read his notes in detail.  Apparently, he prepares notes after he reviews things.  They are no part of our trial preparation."  (Tr. 1397.)  Appellee's counsel continued, "I've never seen a report except the report that was produced to you [appellant's counsel]."  (Tr. 1398.)

{¶ 76} Because the existence of a supplemental expert report has not been established, we cannot find error in the trial court's failure to order that appellee produce the same.  Accordingly, we overrule appellant's fourth assignment of error.

### E.  Fifth Assignment of Error

{¶ 77} In the fifth assignment of error, appellant contends the trial court erred in excluding the testimony of family members regarding the severity of Mrs. Stanley's head pain.  As this concerns the review of an evidentiary matter, we apply an abuse of discretion standard.  *Drummond.*

{¶ 78} According to appellant, this case "rests upon evidence that [Mrs. Stanley] was experiencing and reporting" the worst headache of her life and that had medical personnel followed the standard of care, the hemorrhage would have been diagnosed earlier and a better outcome would have resulted.  (Appellant's Brief, 60.)  While appellant makes several blanket assertions that the testimony of family members was not admitted, as appellant recognizes in his appellate brief, much of the testimony elicited was ultimately allowed over objection.

{¶ 79} The specific testimony that was not permitted by the trial court, but was proffered for the record, was given in response to this specific question posed to appellant: "If the nurse had asked you if this was the worst headache of [Mrs. Stanley's] life, how would you have responded?"  (Tr. 206.)  Appellee objected on the basis of

speculation and the trial court sustained the objection.  Thereafter, counsel for both parties argued their respective positions and appellee repeated, "the question as it's asked is seeking speculation of something that he himself can't testify to, whether it was or was not that patient's worst headache of her life."  (Tr. 207-08.)  The trial court asked appellant's counsel to repeat the question, and the following exchange occurred:

> Q. My question is * * * if a nurse had come to you and asked you is this the worst headache that your wife has ever experienced, how would you respond?  What would you have told the nurse?
>
> A.  The very worst.
>
> [APPELLEE'S COUNSEL]: Objection for the same reasons, Your Honor.  I'm not sure how he can even answer that question.
>
> THE COURT:  Objection will be sustained.

(Tr. 208-09.)

{¶ 80} On appeal, appellant argues Evid.R. 803(3) permits the testimony counsel sought to elicit.  As an exception to the rule excluding hearsay, Evid.R. 803(3) allows a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

{¶ 81} We need not opine as to whether this testimony would be admissible as a statement by the declarant because the specific question posed did not seek an elicitation of how or what Mrs. Stanley said she felt on June 18.  Additionally, appellee did not object to the admittance of appellant's testimony on the basis of hearsay; thus, we find appellant's reliance on the above-quoted hearsay exception misplaced.  Rather, appellee objected to the question on the basis of speculation.  The question, as it was posed, asked appellant how he would have responded if a nurse had asked him "is this the worst headache that your wife has ever experienced."  (Tr. 208.)  There was no evidence regarding whether or not Mrs. Stanley indicated to anyone whether or not she was

experiencing the worst headache of her life. Accordingly, we conclude that, as phrased, the question calls for speculation, and, therefore, the trial court did not abuse its discretion in sustaining appellee's objection on that basis.

{¶ 82} Accordingly, we overrule appellant's fifth assignment of error.

### F. Sixth Assignment of Error

{¶ 83} In the sixth assignment of error, appellant contends the trial court erred in excluding the depositions of Drs. Oplatek and McGregor that were taken prior to trial.

{¶ 84} Appellant first took Dr. Oplatek's deposition on October 27, 2010, and the deposition was conducted in the manner of a discovery deposition in that she was questioned by appellant's counsel with leading questions as if on cross-examination. Though present and lodging objections during this deposition, appellee's counsel did not ask any questions of Dr. Oplatek at this time. In anticipation of trial, Dr. Oplatek was deposed on January 24, 2012, and this deposition was used in place of Dr. Oplatek testifying live at trial.

{¶ 85} In his motion to admit the October 27, 2010 deposition of Dr. Oplatek, who now lives in Illinois, appellant argued the deposition was admissible under Evid.R. 807(D)(2) as an admission by a party opponent. Appellant also argues the deposition was admissible under Civ.R. 32, which provides in relevant part:

> (A) Use of depositions.
>
> Every deposition intended to be presented as evidence must be filed at least one day before the day of trial or hearing unless for good cause shown the court permits a later filing.
>
> At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any one of the following provisions:
>
> * * *
>
> (3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: * * * (b) that the witness is beyond the subpoena power of the court

in which the action is pending or resides outside of the county in which the action is pending unless it appears that the absence of the witness was procured by the party offering the deposition; * * * (e) that the witness is an attending physician or medical expert, although residing within the county in which the action is heard.

{¶ 86} Regarding Dr. McGregor, appellant took his deposition on December 22, 2010. Like the first deposition of Dr. Oplatek, the December 2010 deposition of Dr. McGregor was conducted in the manner of a discovery deposition. At trial in this matter, Dr. McGregor was called as a witness, and he provided live testimony at that time. Appellant sought to admit Dr. McGregor's December 2010 deposition, arguing it was admissible pursuant to Civ.R. 32(A)(3)(e). To the contrary, appellee argued that, while appellant could use the depositions for impeachment purposes, appellant was not permitted to submit either the October or December 2010 deposition as substantive evidence in his case-in-chief.

{¶ 87} After noting that counsel for appellant utilized the depositions to cross-examine the respective doctors during the testimony at trial, the trial court denied appellant's motion to admit the depositions. On appeal, appellant contends this was error because Dr. Oplatek's deposition was admissible under Civ.R. 32(A)(3)(b), and Dr. McGregor's deposition was admissible under Civ.R. 32(A)(3)(e).

{¶ 88} Because this concerns an evidentiary decision, we apply an abuse of discretion standard of review. *Drummond.* Civ.R. 32(A)(3) provides that a deposition may be used by any party for any purpose if one of the factors enumerated in Civ.R. 32 is found to be applicable. Regardless of which party originally took the deposition, it may be used by any party as evidence in the case. *Wood v. Penwell*, 10th Dist. No. 84AP-132 (Nov. 1, 1984). Further, a party is not precluded from using a deposition taken by the adverse party merely because the party had not cross-examined the witness. *Id.*, citing *In re Estate of Soeder*, 7 Ohio App.2d 271 (8th Dist.1966); *Klasmeier v. Residential Servs. Group, Inc.*, 12th Dist. No. CA2007-04-100, 2008-Ohio-2740, ¶ 56.

{¶ 89} While the depositions at issue may have been admissible under Civ.R. 32(A) for the purposes set forth by appellant, the ultimate decision to admit them into evidence remains discretionary. The trial court denied appellant's request to admit them into

evidence because the depositions were utilized by appellant during the cross-examination of the witnesses. In essence, the evidence appellant complains was improperly excluded from trial was introduced and heard by the trial court as the trier of fact.

{¶ 90} Because the evidence was introduced at trial, even if we were to conclude the trial court erred in excluding the October 2010 deposition of Dr. Oplatek and the December 2010 deposition of Dr. McGregor, the error would be harmless. Civ.R. 61 provides:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

{¶ 91} Other than stating it was error, appellant fails to demonstrate how prejudice resulted from the exclusion of the depositions. Additionally, the statements from the depositions taken in 2010 were utilized by appellant to cross-examine the respective doctors and were heard by the trier of fact. Therefore, exclusion of the depositions did not affect appellant's substantial right. *VanMeter v. Coates*, 9th Dist. No. 91CA005220 (Aug. 12, 1992) (any error in excluding "discovery deposition" at trial was harmless error because the appellant failed to allege any prejudice resulting therefrom); *Hurst v. Poelstra*, 2d Dist. No. 94-CA-61 (Dec. 22, 1995) (no error in admission of deposition taken during discovery phase of the case because said error was harmless); *Klasmeier* (error in not allowing plaintiff to use physician's deposition in case-in-chief harmless because admitted in defendant's case).

{¶ 92} Accordingly, we overrule appellant's sixth assignment of error.

### G. Seventh Assignment of Error

{¶ 93} In the seventh assignment of error, appellant contends the trial court held judicial bias and failed to consider all the facts contained in this case.

{¶ 94} Pursuant to R.C. 2701.03, only the chief justice of the Supreme Court of Ohio or his or her designee has the authority to determine a claim that a common pleas court judge is biased or prejudiced. *Ford Motor Credit Co., L.L.C. v. Ryan & Ryan, Inc.*, 10th Dist. No. 09AP-809, 2010-Ohio-2905, ¶ 16; *Corbin v. Dailey*, 10th Dist. No. 08AP-802, 2009-Ohio-881, ¶ 14. Consequently, as a general matter, appellate courts lack authority to consider issues of disqualification. *Capital City Community Urban Redevelopment Corp. v. Columbus*, 10th Dist. No. 12AP-257, 2012-Ohio-6025, ¶ 23; *Ford Motor Credit Corp.* at ¶ 16. R.C. 2701.03, however, does not apply to allegations of bias and prejudice against judges of the Court of Claims. *In re Disqualification of Clark*, 127 Ohio St.3d 1235, 2009-Ohio-7200, ¶ 3.

{¶ 95} The test for determining whether a judge's participation in a case presents an appearance of impropriety is an objective one. *In re Disqualification of Lewis*, 117 Ohio St.3d 1227, 2004-Ohio-7359, ¶ 8. "A judge should step aside or be removed if a reasonable and objective observer would harbor serious doubts about the judge's impartiality." *Id.* Because a judge is presumed to follow the law and not to be biased, the appearance of impropriety must be compelling in order to require recusal. *In re Disqualification of George*, 100 Ohio St.3d 1241, 2003-Ohio-5489, ¶ 5.

{¶ 96} As evidence of the trial judge's alleged bias, appellant directs this court to the trial judge's ruling on evidentiary matters, some of which are set forth in appellant's third, fourth, and fifth assignments of error. Not only have we overruled those asserted assignments of error, "a party's disagreement or dissatisfaction with a court's legal rulings, even if those rulings may be erroneous, is not grounds for disqualification." *In re Disqualification of McKay*, 135 Ohio St.3d 1286, 2013-Ohio-1461, ¶ 8.

{¶ 97} Appellant also directs this court to the trial judge's expressed "impatience" with appellant's trial counsel, as well as the trial judge's indication of what weight may be given to the witnesses' testimonies regarding Mrs. Stanley's pain levels. Appellant emphasizes the following statement made by the trial judge during an objection, "the Court's probably going to give that credit or greater weight from those people, the professionals, than the family." (Tr. 159.) In appellant's view, this statement demonstrates the trial judge's partiality towards appellee and that the trial judge "ignored" the family members' testimonies on the issue of Mrs. Stanley's pain levels.

{¶ 98} Appellant, however, takes this statement out of context. During the testimony of Kesterson, Mrs. Stanley's mother, appellee lodged an objection on the basis that the testimony to be elicited consisted of inadmissible hearsay. The trial judge stated:

> Counsel, we already know that from the nurse's records and the charts here that the pain that she was experiencing at or about this time is 10 out of 10. I don't know if we can get any worse, and these are people that recognize it and live with it everyday, and the Court's probably going to give that credit or greater weight from those people, the professionals, than the family. Not to take anything away from them or to demean what was going on at that point or reduce that. That's not the point, but I'm just trying to save you time and effort in this matter.

(Tr. 158-59.)

{¶ 99} Though the trial judge may have given an indication that he would find the medical records to be credible, contrary to appellant's assertion, this commentary does not indicate a partiality to appellee and a bias against appellant's testifying witnesses. In our view, it is recognition by the trial court that there was little dispute that Mrs. Stanley's pain level was severe because even the medical records indicated the medical staff was charting ten out of ten pain and that the trial judge "[didn't] know if [the pain] can get any worse." (Tr. 158.)

{¶ 100} We have reviewed the totality of the trial judge's evidentiary rulings as well as the trial judge's statements appellant has challenged on appeal. After such review, we conclude appellant has failed to overcome the presumption of lawfulness and impartiality in the trial judge's participation in this case. Accordingly, we overrule appellant's seventh assignment of error.

### H. Eighth Assignment of Error

{¶ 101} In the eighth assignment of error, appellant contends the trial court erred in dismissing the claim for lack of informed consent.

{¶ 102} In the complaint, appellant asserted the June 16, 2008 surgery was performed allegedly without Mrs. Stanley's informed consent because appellee's agents and employees failed to disclose and discuss the material risks and benefits involved with respect to "the treatment options" available for her diagnosed condition. (Amended

Complaint, 4.)   Specifically, appellant alleged Mrs. Stanley was not informed of the material benefits connected with the Gamma Knife radiotherapy procedure.  According to appellant's claim, had the material risks and benefits inherent and incidental to both options been disclosed, a reasonable person in Mrs. Stanley's position would have decided against the surgical option.

{¶ 103} Appellee filed a motion on February 2, 2012 seeking a dismissal of appellant's claim for lack of informed consent.  Arguing that no evidence sufficient to set forth a cognizable claim for lack of informed consent had been presented, appellee sought dismissal pursuant to Civ.R. 41(B)(2), which provides:

> Dismissal; Non-jury action.
>
> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of the plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.  The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.  If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Civ.R. 52 if requested to do so by any party.

{¶ 104} Civ.R. 41(B)(2) allows a trial court to determine the facts by weighing the evidence and resolving any conflicts therein.  *Whitestone Co. v. Stittsworth*, 10th Dist. No. 06AP-371, 2007-Ohio-233, ¶ 13; *Sharaf v. Youngman*, 10th Dist. No. 02AP-1415, 2003-Ohio-4825, ¶ 8.  If, after evaluating the evidence, a trial court finds the plaintiff has failed to meet her burden of proof, then the trial court may enter judgment in the defendant's favor.  *Daugherty v. Dune*, 10th Dist. No. 98AP-1580 (Dec. 30, 1999).  Therefore, even if the plaintiff has presented evidence on each element of her claims, a trial court may still order a dismissal if it finds the plaintiff's evidence is not persuasive or credible enough to satisfy her burden of proof.  *Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, ¶ 9 (10th Dist.).  An appellate court will not overturn a Civ.R. 41(B)(2) involuntary dismissal unless it is contrary to law or against the manifest weight of the evidence.  *Whitestone Co.* at ¶ 13; *Sharaf* at ¶ 8.

{¶ 105} The doctrine of informed consent emerged in the context of the tort of battery because courts treated the failure to obtain informed consent as "vitiating the patient's consent to the procedure."  *White v. Leimbach*, 131 Ohio St.3d 21, 2011-Ohio-6238, ¶ 23.  However, because the issue began to be recognized as one pertaining to the standard of professional conduct, negligence has now generally displaced battery as the basis for liability.  *Id.*

{¶ 106} As set forth in *Nickell v. Gonzalez*, 17 Ohio St.3d 136 (1985), syllabus, the tort of lack of informed consent is established when:

> (a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;
>
> (b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and
>
> (c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy.

{¶ 107} As stated in *White*, " 'a risk is material when a reasonable person, in what the physician knows or should know to be the patient's condition, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed treatment.' "  *Id.* at ¶ 32, quoting *Nickell* at 139.  In the context of a claim for lack of informed consent, expert medical testimony is required to establish the material risks and dangers inherently and potentially involved with a medical procedure, but what a reasonable patient would have done in light of these disclosed risks is determined by the trier of fact.  *White* at ¶ 37.  Expert medical testimony is also required to establish that an undisclosed risk or danger actually materialized and proximately caused injury to the patient.  *Id.* at ¶ 38.

{¶ 108} Thus, pursuant to *Nickell*, appellant needed to present evidence showing: (1) that Dr. Jacob failed to disclose and discuss with Mrs. Stanley the material risks and dangers inherently and potentially involved with respect to surgically removing the acoustic neuroma, (2) that the unrevealed risks and dangers "*which should have been*

*disclosed*" by Dr. Jacob actually materialized and proximately caused her injury, and (3) a reasonable person in Mrs. Stanley's position would have rejected the surgery had these risks and dangers been disclosed to her. (Emphasis added.) *Id.* at syllabus.

{¶ 109} Though citing to the standard set forth in *Nickell*, appellant asserts Dr. Jacob "emphasized the positive aspects" of open-skull surgery, but did not emphasize or properly characterize the "positive aspects" of stereotactic radiation. (Appellant's Brief, 74.) Appellant does not argue appellee failed to disclose and discuss the material risks and dangers of the proposed therapy, open-skull surgery, but, instead, argues appellee failed to disclose and discuss the benefits of a procedure *not* being performed by Dr. Jacob. In essence, appellant's claim seeks recovery for conduct not encompassed within the theory of informed consent.

{¶ 110} In *White*, the plaintiff underwent two surgeries and asserted the doctor involved failed to warn him that the second surgery posed a greater risk of an adverse outcome than the first. The trial court directed a verdict in the doctor's favor after finding the plaintiff failed to present expert testimony concerning whether the material risks and dangers of the second surgery actually materialized and proximately caused the plaintiff's injury. In a split decision, this court vacated that verdict. The Supreme Court of Ohio reversed this court's judgment and found the trial court properly directed a verdict in favor of the doctor. The court stated:

> Regarding the second element, that the *undisclosed risks* materialized and proximately caused the injury, the Whites failed to meet their burden to produce expert testimony showing it to be more likely than not that the *undisclosed greater risk* of nerve damage from the second discectomy materialized and proximately caused White's injury.

(Emphasis added.) *Id.* at ¶ 42.

{¶ 111} In the case before us, there is no evidence of an *undisclosed risk of surgery* materializing and causing injury. None of the evidence presented established appellee failed to disclose a known risk of the surgery performed, nor is there any evidence linking an undisclosed risk of surgery to Mrs. Stanley's injury. Instead, Dr. Jacob testified, "I went over the risks, benefits of all interventions and specifically focused on the surgery because that was her decision." (Tr. 281.) Additionally, Mrs. Stanley signed a written

consent form outlining the risks of the proposed treatment. Dr. Jacob testified the consent form ends with "three major potential complications, including intracranial brain injury, paralysis and coma, and death, in no uncertain terms that those are the risks of this operation." (Tr. 282.) Dr. Jacob further testified that these risks were specifically discussed with Mrs. Stanley.

{¶ 112} Dr. Jacob also testified that, to the best of his ability, he provided the risks and benefits associated with all three treatment options. This was corroborated by the testimonies of Mrs. Stanley's family members who testified Mrs. Stanley considered the three options available to her. While appellant argues Mrs. Stanley could not have given informed consent because Dr. Jacob allegedly provided inaccurate information about the Gamma Knife radiotherapy procedure, we reiterate the tort of informed consent concerns disclosure of the risks and dangers associated with the procedure intended to be performed. *Nickell* at syllabus.

{¶ 113} In *Ellinger v. Ho*, 10th Dist. No. 08AP-1079, 2010-Ohio-553, the decedent's family filed suit against the decedent's doctor alleging, inter alia, that the doctor failed to obtain the decedent's informed consent prior to performing surgery on the decedent. Specifically, the plaintiffs asserted the doctor failed to inform the decedent about the treatment option of chemotherapy. A jury returned a verdict in the doctor's favor. On appeal, the plaintiffs argued the jury should have been instructed that they could find the doctor liable for his alleged failure to disclose and discuss the material risks of not being treated with chemotherapy, a treatment the doctor did not perform. In other words, the plaintiffs sought recovery under the theory of informed consent for the doctor's failure to inform the decedent that death could result from not undergoing chemotherapy. This court held the requested instruction would have allowed recovery for conduct that is not actionable. The *Ellinger* court stated:

> Pursuant to plaintiffs' jury instruction, a jury could find Ho liable because he did not tell Butterbaugh about a risk that could arise if Butterbaugh did not undergo chemotherapy; a treatment that Ho never recommended. Thus, in plaintiffs' version of the tort of lack of informed consent, *a physician could be liable if he failed to inform his patient about the risks of not submitting to a treatment that the physician did not propose to perform.* However, the law of informed

> consent does not require a physician to educate his or her patients generally on medical matters. *Turner v. Children's Hosp., Inc.* (1991), 76 Ohio App.3d 541, 554, 602 N.E.2d 423. The physician's duty to inform *only extends to "the material risks and dangers inherently and potentially involved with respect to the proposed therapy."* *Nickell* at 139. Because plaintiffs' requested jury instruction expanded the scope of the tort of lack of informed consent beyond that duty, it incorrectly stated the law. We conclude, therefore, that the trial court did not err in refusing to give the instruction plaintiffs requested to the jury.

(Emphasis added.) *Id.* at ¶ 42.

{¶ 114} Similarly, in *Moore v. Univ. of Cincinnati Hosp.*, 93 Ohio App.3d 616 (10th Dist.1994), the plaintiff filed suit arguing the defendant was negligent in failing to recognize that a patient's sickle cell crisis would, and did, lead to a bone marrow infarction that ultimately led to the patient's death. On appeal, the plaintiff argued the trial court erred in failing to address her cause of action based on lack of informed consent. Finding "no merit" to said contention, this court stated, "[t]his is not a case *involving a procedure performed for which the physician failed to inform the patient of its consequences.* Rather, this case is based on an alleged failure to properly diagnose and subsequently treat accordingly." (Emphasis added.) *Id.* at 619.

{¶ 115} In this case, the evidence established the risks of the surgery performed on June 16 were disclosed to Mrs. Stanley, and the record contains no evidence that unrevealed risks and dangers, which should have been disclosed by the physician, actually materialized and proximately caused the injury to Mrs. Stanley.

{¶ 116} In his appellate brief, appellant cites to what he terms are inaccuracies in Dr. Jacob's statements pertaining to the risks and benefits of Gamma Knife radiotherapy. According to appellant, this inaccurate information did not allow Mrs. Stanley to make an informed choice about which option of therapy to pursue. While such alleged conduct on the part of Dr. Jacob may result in liability under another cause of action, it cannot give rise to a claim of lack of informed consent because said tort relates to the disclosure of risks and dangers associated with the procedure being or intended to be performed. *Nickell*; *White*; *Ellinger*; *Wheeler v. Wise*, 133 Ohio App.3d 564 (10th Dist.1999) (plaintiffs confused their cause of action sounding in negligence for rendering an

improper diagnosis with a cause of action designed to prevent an unauthorized or uninformed touching).

{¶ 117} Accordingly, we conclude the trial court's dismissal, pursuant to Civ.R. 41(B)(2), of appellant's claim for lack of informed consent was not against the manifest weight of the evidence, and we overrule appellant's eighth assignment of error.

### I. Ninth Assignment of Error

{¶ 118} In the ninth assignment of error, appellant contends the trial court erred in denying his motion for a copy of an audio and visual recording of the trial proceedings that occurred from January 30 to February 3, 2012.

{¶ 119} As reflected in our recitation of this matter's procedural history, trial commenced on January 30 and continued until February 3, 2012. The parties agreed that trial would reconvene on March 28. In the interim, appellant filed a motion on March 21, requesting a copy of the DVD recording of the prior proceedings. According to the motion, a written transcript could not "communicate the entire story" because, during their testimony, several witnesses "pointed to images on the screen located within the courtroom." (Mar. 21, 2012 Motion, 1.) Because the specific areas pointed to were not identifiable within the written transcript, appellant argued a copy of the DVD recording was necessary.

{¶ 120} By entry filed March 27, 2012, the trial court denied appellant's request because the DVD recording was not the medium used by the court reporter to create the transcript of the proceedings. The trial court also denied the motion on the basis that, to the extent counsel argued the transcript was lacking, counsel could have but failed to ensure such information was made a part of the trial record. On appeal, appellant argues that, as a result of the trial court's denial of his request, he was unable to point out that a defense witness misidentified the bleed in the brain by pointing to the wrong part of the brain. (Appellant's Brief, 82.) When a witness is testifying and points to a specific location of an exhibit, "[i]f a different location was indicated, it was the duty of the litigant whose interest would be served thereby to make the record affirmatively show it." *Gibson v. Johnson*, 69 Ohio App. 19, 22 (1st Dist.1941).

{¶ 121} Upon review, we perceive no abuse of discretion in the trial court's decision to deny appellant's request for a copy of the DVD recording of the proceedings that occurred January 30 through February 3, 2012.

{¶ 122} Accordingly, we overrule appellant's ninth assignment of error.

### J.  Tenth Assignment of Error

{¶ 123} In his tenth assignment of error, appellant contends the cumulative effect of all of the asserted errors denied him a fair trial and due process of law.  In support, appellant incorporates "all the reasons previously stated" in the appellate brief.

{¶ 124} The cumulative error doctrine holds that a judgment may be reversed if the cumulative effect of multiple errors deprives a defendant of his constitutional rights even though, individually, the errors may not rise to the level of prejudicial error or cause for reversal.  *See State v. Garner*, 74 Ohio St.3d 49, 64 (1995).  However, this court has previously noted that the cumulative error doctrine is not typically employed in civil cases.  *Bogdas v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-466, 2009-Ohio-6327, ¶ 43; *see also Westlake v. Ohio Dept. of Agriculture*, 10th Dist. No. 08AP-71, 2008-Ohio-4422, ¶ 25, citing *Sykes v. Gen. Motors Corp.*, 11th Dist. No. 2003-T-0007, 2003-Ohio-7217, ¶ 39.  In addition, having discussed appellant's previous assignments of error and failing to find any error, we discern no basis for considering the question of cumulative error.  *See Bogdas* (without error, harmless or otherwise, there can be no cumulative error).

{¶ 125} Accordingly, we overrule appellant's tenth assignment of error.

## V.  CONCLUSION

{¶ 126} Having overruled appellant's ten assignments of error in their entirety, the judgment of the Court of Claims of Ohio is hereby affirmed.

*Judgment affirmed.*

TYACK and DORRIAN, JJ., concur.

_____