[Cite as *Estrada v. Univ. of Toledo Med. Ctr.*, 2017-Ohio-821.]

| ROSA ESTRADA, Admx. | Case No. 2012-07218 |
|---|---|
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| UNIVERSITY OF TOLEDO MEDICAL CENTER | |
| Defendant | |

**{¶1}** Plaintiff, Rosa Estrada, is the administrator of the estate of Rosemarie Becerra and brings this action for wrongful death. The action proceeded to trial before the undersigned magistrate.

**{¶2}** At the time relevant to this case, John P. Geisler, M.D. was the Director of Gynecologic Oncology in the University of Toledo College of Medicine and Life Sciences. Dr. Geisler testified that he is board-certified in obstetrics and gynecology, and in the sub-specialty of gynecologic oncology. Dr. Geisler testified that he is currently licensed to practice medicine in several states, including Georgia, where he is now a gynecologic oncologist at the Cancer Treatment Centers of America facility in Newnan, Georgia. Dr. Geisler stated that he performs about six to eight operations per week.

**{¶3}** Dr. Geisler testified that he first saw Mrs. Becerra on September 9, 2010. Dr. Geisler testified that Mrs. Becerra, who was 62 years old at the time, was referred to him based upon concerns about intermittent post-menopausal bleeding over the prior two years, and the referring doctor had recently found her to have complex hyperplasia with atypia, and both of these conditions have a correlation with endometrial cancer. Indeed, Dr. Geisler explained that complex hyperplasia with atypia is a precancerous growth and there is little to distinguish it from grade one endometrial cancer.

{¶4} Dr. Geisler related that after meeting with Mrs. Becerra, the treatment plan agreed upon was a total hysterectomy with a bilateral salpingo-oophorectomy. Dr. Geisler stated that in some younger patients who are looking to preserve fertility, the first line of treatment is progestin, but he stated that a hysterectomy is the definitive treatment in a patient for whom fertility is not an issue.

{¶5} The surgery was performed on September 20, 2010, Dr. Geisler stated, and assisting him were resident physicians Drs. Kathleen Rinkes and Megan Lutz. In addition to removing the uterus, tubes, and ovaries, Dr. Geisler stated that he also decided during the surgery to remove some lymph nodes. Dr. Geisler stated that the plan had been to send out a frozen section and, if found to be positive for cancer, to subsequently remove lymph nodes, but he explained that during the operation he observed a large polypoid area that was suspicious for cancer, and he added that frozen section testing is known to be unreliable for detecting grade one endometrial cancer.

{¶6} Dr. Geisler testified that during the operation a coagulant was administered because a significant amount of bleeding occurred, especially from the back of the vaginal cuff, and it was the kind of diffuse "oozing" that is seen in patients with cirrhosis of the liver, which inhibits the body's clotting function. Dr. Geisler stated that he would have recommended a course of radiation rather than surgery if he had known this kind of bleeding might occur, and that liver disease significantly raises the risk of mortality in such surgeries, but Mrs. Becerra had no known pre-operative history of liver disease or dysfunction. Dr. Geisler acknowledged that in the operative report, there was a discrepancy in the estimated blood loss between what he estimated and the larger quantity that the anesthesia team estimated, and that it appears to have been his mistake.

{¶7} Dr. Geisler also described finding that Mrs. Becerra had a hernia which had recurred at some point after a prior hernia repair surgery, and the mesh that had been

placed during that surgery was present, with necrotic tissue attached. According to Dr. Geisler, the risk of abdominal infection was already higher due to the amount of bleeding that occurred during the operation, and putting new mesh in the abdomen carried more risk of infection, so he opted to remove the old mesh and not place any new mesh. Dr. Geisler stated that the hernia was repaired though, and the surgical wound was closed with a running mass closure with absorbable sutures, and the skin was stapled. Dr. Geisler also stated that he asked Dr. Kelly Manahan, who is his wife and also worked in the department, to scrub in and help with the closure.

{¶8} Dr. Geisler testified that one day after the operation, on September 21, 2010, Mrs. Becerra was basically doing as well as would be expected. According to Dr. Geisler, Mrs. Becerra had some development of acute tubular necrosis in her kidneys, but her urinary output continued to function well enough that there was no need to involve the nephrology department. Two days after the operation, on September 22, 2010, Dr. Geisler stated, Mrs. Becerra was given transfusions to keep her hemoglobin levels up because she had risk factors for heart disease. Dr. Geisler stated that Mrs. Becerra did have some nausea but apparently no vomiting, and he also noted that while there had been no bowel movements up to that point, it is fairly common for a patient to have an ileus or not move their bowels at that point.

{¶9} Dr. Geisler stated that he did not see Mrs. Becerra on the third day after the operation, on September 23, 2010, but that Dr. Manahan did, and the records show that a CT scan was performed that day which was interpreted by the radiologist as depicting a large ventral hernia. Dr. Geisler testified that this meant the fascial incision dehisced and caused the prior hernia to recur, but there was no evisceration of the skin at the incision site and there was no emergent need to operate again at that time. Dr. Geisler explained that a large hernia is not as concerning as a small hernia, because small hernias have a greater risk of strangulating the bowel, which results in the blood supply being cut off and leading to ischemia, which can result in necrosis of the bowel tissue

and perforation that allows bowel contents to spill into the abdomen. Generally speaking, Dr. Geisler stated, a large hernia does not put patients at risk of strangulation.

{¶10} According to Dr. Geisler, acute abdominal pain is the most common sign of bowel strangulation, and lactic acid and pH levels are also indicators in that the lactate level goes up with dead tissue and the pH level goes down. Dr. Geisler testified, though, that on September 24, 2010, Mrs. Becerra had a normal pH level and she was not showing the signs of a bowel strangulation. Even though there had still been no bowel movement, Dr. Geisler stated that a post-operative ileus can take several days to resolve, and the protocol generally is to wait seven days and then administer IV nutrition until bowel function returns.

{¶11} Dr. Geisler stated that on September 25, 2010, he was home for the weekend, but he was available by telephone and another doctor was at the hospital. Dr. Geisler testified that Dr. Rinkes was seeing Mrs. Becerra at that time and attempting to determine the cause of confusion that she had started having, and insofar as Dr. Rinkes documented that she suspected hepatic encephalopathy, Dr. Geisler explained that this is the term for mental status changes resulting from the liver's inability to filter ammonia or other toxins from the blood.

{¶12} As Dr. Geisler recounted, the records reflect that later on September 25, 2010, Mrs. Becerra vomited and was consequently taken for imaging in the x-ray room, where she vomited again, aspirated the emesis, and suffered cardiac arrest, but after 15 to 20 minutes was finally resuscitated. Dr. Geisler related that on the morning of Sunday, September 26, 2010, he was called and returned to the hospital after Mrs. Becerra had suffered the cardiac arrest and gone to the ICU. Dr. Geisler stated that he concluded that essentially the only thing that could be done to try to help Mrs. Becerra at that point was to operate on her a second time to explore the bowel and try to remove any ischemic portions, and the family wanted him to do whatever he could, but both he and the family had concerns that this might not be of any benefit.

{¶13} When he started this second operation, Dr. Geisler stated, he opened up the same incision from the first operation, and when he removed the staples he did observe ischemic or necrotic bowel. Dr. Geisler stated that he removed two sections of necrotic bowel which had no blood flow. Dr. Geisler testified that he does not know for certain whether the sections of necrotic bowel were the sections that were protruding through the hernia, and he explained that whether it was those particular sections was inconsequential because none of the bowel had become incarcerated in the hernia, much less strangulated. Dr. Geisler made clear that when he visualized the bowel, he saw no evidence at all of a bowel strangulation or obstruction, and he stated that a strangulation does not go on for days without a perforation occurring. Rather, in Dr. Geisler's opinion, the bowel started to turn ischemic and necrotic due to diminishment of the blood supply during and after the episode of aspiration and cardiac arrest.

{¶14} Dr. Geisler admitted that his pre-operative report from the second surgery shows that he was aware Mrs. Becerra's pupils were fixed and dilated beforehand, and that she appeared to be brain dead, but he stated that he did not have confirmation of brain death from the neurology department at that point. And, he stated, there was no harm to Mrs. Becerra in performing the second operation. Dr. Geisler stated that family members later wanted or even demanded that he operate a third time, but he told them no, and he elicited second and third opinions from other doctors in order to satisfy the family.

{¶15} Regarding the sequence of events leading to Mrs. Becerra's death, Dr. Geisler testified that Mrs. Becerra had a post-operative ileus, she vomited and aspirated the emesis which led to cardiac arrest, and the lack of blood flow from the cardiac arrest caused the failure of multiple organs. Dr. Geisler explained that a patient with liver disease has a diminished ability to process medications and to heal, and that this affects the rest of the body's systems, and having a cirrhotic liver can make it

impossible to recover from an insult to the body like the initial surgery here. Dr. Geisler testified that the liver had to process the medication from the anesthesia and it also endured a period of hypotension during the surgery. Dr. Geisler related that poor blood clotting is one sign of liver disease, which occurred during surgery, and other signs here were elevated bilirubin and low albumin levels post-operatively, and he added that he would not knowingly operate on a patient with an albumin level as low what Mrs. Becerra had at one point because the patient's healing ability is simply too low. Although Mrs. Becerra's liver enzymes remained normal, Dr. Geisler stated that it is common for patients with liver disease to have normal liver enzymes unless there is an acute-stage inflammation. Dr. Geisler acknowledged that Mrs. Becerra's death summary did not refer to cirrhosis, but he also stated that the death summary was prepared by a resident, and, furthermore, the autopsy diagnosed Mrs. Becerra as having cirrhosis.

{¶16} Kelly J. Manahan, M.D. testified that she is board-certified in obstetrics and gynecology, and the sub-specialty of gynecologic oncology. Dr. Manahan is currently licensed to practice medicine in the state of Georgia, where she is a gynecologic oncologist at the Cancer Treatment Centers of America facility in Newnan, Georgia.

{¶17} At the time relevant to this case, Dr. Manahan was a Professor and Chair of the Department of Obstetrics and Gynecology in the University of Toledo College of Medicine and Life Sciences. Dr. Manahan remembered Dr. Geisler calling her to the operating room to assist during the initial operation on September 20, 2010. As Dr. Manahan recalled, there was a resident assisting who was relatively new, and when the bleeding from the vaginal cuff was observed she was called in to assist. From Dr. Manahan's description, the bleeding was a generalized oozing from the vaginal cuff. Dr. Manahan stated that she was not present when the surgical wound was closed.

{¶18} Dr. Manahan testified that the only time she saw Mrs. Becerra after the operation was three days later, on September 23, 2010. Dr. Manahan explained that

residents were expected to make rounds before 7:00 a.m. and subsequently meet with the attending physician to discuss, and then the attending physician would go see patients and decide whether to concur with the resident.  In this case, Dr. Manahan stated, she reviewed progress notes that Dr. Lutz, the resident, prepared that morning.

{¶19} Dr. Manahan stated that after seeing Mrs. Becerra she substantially agreed with what Dr. Lutz had written, but, in regard to the firmness that Dr. Lutz noted in the right side of the abdomen, Dr. Manahan wrote that she did not suspect bowel necrosis, citing Mrs. Becerra's normal lactate level.  As Dr. Manahan explained, lactic acid is a marker for whether to suspect necrosis somewhere in the body.  And, as Dr. Manahan recalled, the mass appeared to be either normal post-operative inflammation or a ventral hernia.  Dr. Manahan also stated that she took into account that Mrs. Becerra was not tender and that there had been a pre-existing ventral hernia.  As Dr. Manahan explained, a necrotic bowel or a strangulated bowel will often be tender and affect the patient's vital signs in certain ways that were not evident in this case.  Signs of a strangulated bowel, Dr. Manahan related, can include vomiting, elevations in the white blood cell count and in lactic acid, declining kidney function, and abdominal tenderness, rebounding, and guarding.

{¶20} According to Dr. Manahan, Dr. Lutz came back to her that afternoon and was concerned that there had still been no bowel function.  At that point, Dr. Manahan stated, they decided to order a CT scan with an oral contrast.  After it was performed, Dr. Manahan stated, she read the radiologist's report and also reviewed the CT film herself, and she agreed with the radiologist's finding of a large ventral hernia without evidence of strangulation or obstruction.  In other words, Dr. Manahan stated, the prior hernia had recurred, but neither the CT scan nor her personal observations of the patient that day indicated that the bowel was strangulated by the hernia or that the bowel was obstructed.

{¶21} Dr. Manahan testified that Mrs. Becerra's condition on September 23, 2010, did not constitute a surgical emergency. Actually, according to Dr. Manahan, 70-90% of bowel obstructions resolve without surgical intervention, and unless there had been no return of bowel function after 7 to 10 days post-operatively, surgical exploration of the bowel would not be indicated. Dr. Manahan explained that a post-operative ileus and a small bowel obstruction tend to have very similar symptoms.

{¶22} Rosa Estrada, R.N. is Mrs. Becerra's daughter and has worked as a registered nurse for 15 years. Estrada testified that she came to the hospital to visit on the day of the surgery, and the next day as well, and nothing seemed out of the ordinary to her. By the afternoon of September 22, 2010, however, Estrada stated that when she visited she noticed there was a mass in the right side of the abdomen, and she showed it to a nurse. Estrada stated that Mrs. Becerra was still tired and groggy, in pain, not eating, and had a wound vacuum on her that had been placed the day before. Estrada testified that on the evening of September 23, 2010, she telephoned Mrs. Becerra, who had trouble responding to questions, exhibited some confusion, and did not seem like herself.

{¶23} On September 24, 2010, Estrada stated, she visited around 5:00 or 6:00 p.m. and observed that Mrs. Becerra was restless and confused, not making sense, and trying to get out of bed. According to Estrada, the mass in the abdomen was red and about the size of a tennis ball. Estrada related that she talked to Dr. Rinkes about her concerns, and when Rinkes examined Mrs. Becerra and asked her for her date of birth, she just repeated the answer over and over again.

{¶24} Estrada explained that she was returning to her own job that week after a period of maternity leave, and she had little choice but to go to work on September 25, 2010, despite her concerns. Estrada stated, though, that after her sister-in-law, Amanda Becerra, called her for a second time while she was at work that day and advised her of the worsening situation, she got permission to leave and came to the

hospital around 6:30 p.m.  Just after she got there, Estrada stated, Mrs. Becerra began vomiting and was still restless, trying to get out of bed.  Estrada testified that she spoke with a nurse due to the quantity and "coffee ground" consistency of the emesis, and expressed her opinion to the nurse that a nasogastric tube should be placed.

{¶25} Estrada recounted that an abdominal x-ray was ordered, and that she and Amanda Becerra went along to the x-ray room when Mrs. Becerra was transported there.  Estrada testified that while they waited outside, one of the technicians came and said that Mrs. Becerra had vomited and that towels were put around her neck and a transport team had been called.  From Estrada's description, there was emesis on the towels and Mrs. Becerra continued vomiting.  Estrada also described the x-ray technicians as not being helpful, including not calling the nursing supervisor as she requested, but that she did get suction equipment from the technicians.  But, Estrada testified, Mrs. Becerra's eyes rolled back and she became unresponsive, at which point Estrada demanded that the technicians call a code.

{¶26} Estrada stated that when the code team arrived, she helped them resuscitate Mrs. Becerra, which was difficult and took a long time, but finally a pulse was detected and Mrs. Becerra was sent to the ICU.  Estrada described shocked family members, including Mr. Becerra, coming upon the scene while all this occurred.  Estrada also described how difficult it has been for her to deal with the fact that this sequence of events happened in front of her while she was trying to care for her mother, when she felt that she needed to intervene due to what she perceived as inaction or delay on the part of the hospital staff.  Estrada recalled seeing Mrs. Becerra in the ICU that night and being optimistic that she would survive, at least on a ventilator.

{¶27} Estrada stated that she returned to the hospital the next morning after getting a phone call from a nurse around 6:00 a.m., informing her that Dr. Geisler wanted to operate again.  Estrada testified that when she got to the hospital, Dr. Geisler

spoke to the family about his concern for the bowel and said that operating might be of some help, and it was not mentioned that Mrs. Becerra had fixed or dilated pupils.

{¶28} According to Estrada, when the operation was over she went to the surgical ICU, and while she was there she opened Mrs. Becerra's eyelids and saw that the pupils were fixed and dilated, and a nurse told her they had been like that before the operation. Estrada described feeling sick to her stomach over this, feeling that Mrs. Becerra had already been brain dead and that there was thus no point in the operation, and she kept this to herself so as not to upset the rest of the family even more.

{¶29} Estrada recalled Dr. Geisler meeting with the family after this operation and using a white board to show what he had done, and he said the plan would be to monitor Mrs. Becerra for the next 24 to 48 hours, but that she was in poor condition. Estrada stated that other doctors met with the family also, and around 9:00 p.m. one of them stated that brain death had occurred, and Mr. Becerra, though he initially could not come to terms with this and asked the doctors to operate once more, ultimately made the decision at the doctors' recommendation to put on a "do not resuscitate" order. Estrada testified that the next morning, after a neurologist definitively confirmed the absence of brain activity, support was removed and Mrs. Becerra expired with her family at her side.

{¶30} Estrada talked about the close-knit nature of the family, including her and her seven siblings, all of whom live in the Toledo area, and 36 grandchildren, as well as Mrs. Becerra's own siblings. Estrada recounted how Mrs. Becerra constantly traveled to visit with them, to watch grandchildren's sporting events and other activities, and to babysit, and that she also provided good counsel and kept the peace between everyone. Estrada told how Mrs. Becerra was known for cooking, baking, and sewing dresses for special occasions, and how everyone looked forward to holidays with her, especially Halloween. Estrada listed many important family events that have happened

since Mrs. Becerra's passing, and how difficult it has been for some of the family to cope with her loss. Family members gather at Mrs. Becerra's grave on her birthday and wedding anniversary, and also Mother's Day, Estrada explained, to reminisce and release balloons in her memory.

{¶31} Amanda Becerra, R.N. is married to Mr. and Mrs. Becerra's youngest son, Jose, and at the time of these events she was a full-time nursing student. Amanda, who shall hereinafter be referred to by her first name so as to avoid confusion, testified that she and her husband visited the hospital on September 22, 2010, but the next day they did not go after being advised that Mrs. Becerra did not feel like seeing more visitors. Amanda stated that she and her husband, as well as their son, visited on the evening of September 24, 2010, and at that point Mrs. Becerra was confused and disoriented and did not recognize Amanda. Amanda testified that she was very concerned and consequently returned the next day, remaining while Mr. Becerra had to leave for a work event. Amanda recounted that Mrs. Becerra's head was back, she was more confused, and she was trying to get up and go to the bathroom even though she was catheterized.

{¶32} Amanda stated that she relayed her concerns to a nurse and that an aide had to help her get Mrs. Becerra back in the bed at one point. Amanda described getting more concerned as Mrs. Becerra's head started bobbing and her eyes became glossy, leading Amanda to call other family, including Estrada. Amanda stated that soon after Estrada and other family members came to the hospital, Mrs. Becerra commenced projectile vomiting a dark, coffee ground emesis. According to Amanda, Zofran was administered and after Estrada suggested placing a nasogastric tube, a nurse said an x-ray would need to be taken first.

{¶33} Amanda testified that she and Estrada accompanied Mrs. Becerra to the x-ray room and waited outside. Amanda stated that the x-ray technicians came out and asked them to go inside because Mrs. Becerra had vomited again, and when they went

in she saw towels around Mrs. Becerra's neck covered with more emesis. Amanda remembered that Mrs. Becerra's color was off, she started vomiting more, and she was not responsive. Amanda stated that after Estrada requested and was given suction equipment by the technicians, the two of them tried to get Mrs. Becerra on her side and start suctioning. From Amanda's recollection, the technicians were not helpful and were even dismissive when Estrada asked them to call for help, until finally Estrada demanded that they call a code and then a code team responded. Amanda stated that she left the room while Estrada briefed the code team on what had happened.

{¶34} Amanda testified that she was present on the morning of September 26, 2010, when Dr. Geisler spoke to the family. Amanda stated that Dr. Geisler said there seemed to be some problem with the bowel and he discussed performing an exploratory surgery, and the impression that he gave was that Mrs. Becerra might be able to survive, albeit with a colostomy. According to Amanda, it was not communicated to the family that Mrs. Becerra was likely brain dead, or that her pupils were fixed and dilated. Amanda testified that after this surgery, Dr. Geisler talked to the family about the sections of bowel that he removed and she did not recall him giving any prognosis. Amanda also testified that she was present that night when Dr. Geisler returned to the hospital, and she remembered him being nasty to Mr. Becerra and other family members and saying "I'm the captain of the ship, sue me."

{¶35} Juan Becerra testified that he and Mrs. Becerra, whom he called Rose or Rosie, were just a few days shy of their 43rd wedding anniversary at the time of her passing. Mr. Becerra described the challenges he faced as a young man and in returning from the Vietnam war, and how important Mrs. Becerra was in helping him overcome all that adversity. Mr. Becerra testified similar to Estrada about how large their family has come to be, and he described Mrs. Becerra as the matriarch, a devoted wife, mother, and grandmother. He testified that Mrs. Becerra worked some part-time jobs over the years, but was not working at the time of her passing, at which time they

were both looking forward to retirement and focusing on their family. He stated that Mrs. Becerra had seven living siblings at the time of her death, and her mother was still alive at that time also.

{¶36} Mr. Becerra testified that he accompanied Mrs. Becerra to the hospital for the surgery and he stayed with her at nearly all times afterward, remaining every night that she was there. He recalled that she was alert the first night, but as the days passed she had very little appetite and did not have any bowel movements. He testified that he started to get more concerned on the morning of September 22, 2010, when Mrs. Becerra needed help taking a pill. By the morning of September 24, 2010, he recalled, Mrs. Becerra's eyes were glassy, she could not speak clearly or understand questions, and something was clearly wrong, yet he remembered a doctor saying that she would be able to go home as soon as she had a bowel movement.

{¶37} Mr. Becerra testified that he left briefly on September 25, 2010, to attend a retirement party for a co-worker, but other family members remained at the hospital. While at the party, he recalled, he got a telephone call saying that Mrs. Becerra was not doing well, so he returned to the hospital. He remembered going to the x-ray room and seeing Mrs. Becerra on a table, with black matter spread around, and she appeared to be in grave condition, but she was resuscitated and transported to the ICU.

{¶38} Mr. Becerra stated that he remained at the hospital overnight, and the next morning Dr. Geisler told him that, if he had permission, he would like to operate to look for a bowel obstruction. Mr. Becerra testified that he consented, and after the operation Dr. Geisler returned and described finding a section of blackened bowel that appeared to be dead, and Dr. Geisler said that the plan would be to wait for about 48 hours to see if bowel function would return. Later that day, however, Mr. Becerra stated that other doctors approached him about putting a do not resuscitate order in effect, and at his request he also was able to speak with Dr. Geisler again, who confirmed that Mrs. Becerra's prognosis was poor. Mr. Becerra stated that it was not until this time that

he learned Mrs. Becerra had gone without a pulse for 15 minutes the day before and was likely brain-dead. As Mr. Becerra described, he had been left with the impression when Dr. Geisler wanted to perform the second surgery that a recovery was possible. Mr. Becerra recalled that toward the end of his conversation with Dr. Geisler that night, Geisler got upset and said "I'm the captain of the ship" and "sue me, but you'll feel bad."

{¶39} According to Mr. Becerra, early on the morning of September 27, 2010, he spoke with other doctors who concurred that nothing more could be done, but they were at least more calm and better able to explain the situation to him, and at his request a neurological consultation was performed to confirm that there was no brain activity. Mr. Becerra testified that all the family was called that morning and several of them were with Mrs. Becerra in her final moments.

{¶40} Plaintiff's expert, Edmund S. Petrilli, M.D., is a physician with board-certification in obstetrics and gynecology, and in the sub-specialty of gynecologic oncology. Dr. Petrilli is currently licensed to practice medicine in the state of Virginia and has privileges at two hospitals. Dr. Petrilli graduated from medical school in 1969 and has an extensive professional history, and he explained that while he has wound his practice down somewhat in recent years, he remains active and sees patients in an office in Manassas, Virginia at least one day a week. According to Dr. Petrilli, he operates on patients about two or three times per month, and he also provides consultations by request for other doctors. Dr. Petrilli served for many years as a faculty member at different teaching hospitals, but no longer teaches on any formal basis.

{¶41} Dr. Petrilli, who stated that he reviewed all the available medical records, described Mrs. Becerra as a 62-year old who was morbidly obese and had a history of multiple surgeries, including a hernia repair, and after complaining of post-menopausal bleeding she was found to have hyperplasia, which Dr. Petrilli described as pre-cancerous. After that finding, Dr. Petrilli stated, Mrs. Becerra's gynecologist

appropriately referred her to Dr. Geisler for consultation. Dr. Petrilli stated that Dr. Geisler recommended a hysterectomy at the consultation, and Dr. Petrilli had some criticism of Dr. Geisler for not noting in the consultation report whether he advised the patient of an alternative progestin treatment, which he stated may be indicated in a patient with her comorbidities.

{¶42} Dr. Petrilli also noted that the operative report from the September 20, 2010 surgery erroneously listed endometrial cancer and liver sclerosis as preoperative diagnoses, even though it was not known before the surgery whether Mrs. Becerra had cancer and there were no liver abnormalities known before the surgery, but he admitted that any such criticism has no bearing on the ultimate outcome. The surgery itself, Dr. Petrilli recounted, entailed removal of the uterus, tubes and lymph nodes. Dr. Petrilli opined that it was a violation of the standard of care to remove lymph nodes here because even though Dr. Geisler did remove a polyp that was later determined to be cancerous, there had been no cancer diagnosis yet at the time of the surgery, but again he acknowledged that this too has no bearing on the ultimate outcome. Dr. Petrilli stated that Dr. Geisler biopsied the liver out of concern for its sclerotic appearance, and Dr. Petrilli acknowledged that the subsequent pathology report on that biopsy did reveal mild chronic hepatitis, but he testified that whereas generalized bleeding during a hysterectomy is indicative of liver disease, the records show that the bleeding in this surgery was in a very specific location. Nevertheless, Dr. Petrilli acknowledged that the amount of blood lost during the surgery was higher than normal. While Dr. Petrilli did not fault Dr. Geisler for not replacing the mesh that had been used in the previous hernia repair, he was critical of the manner in which the wound was closed, although based upon the information available in the medical records he admittedly lacked a factual basis for opining whether the closure complied with the standard of care.

{¶43} On the day after the surgery, September 21, 2010, Mrs. Becerra's creatinine level was elevated and her urine output was low, Dr. Petrilli stated. In Dr.

Petrilli's opinion, these were indications of deteriorating kidney function, or acute tubular necrosis, which should have resulted in a nephrology consultation being ordered, but even though he was critical of Dr. Geisler's management of the kidney issues, he admitted that this had no bearing on the ultimate outcome. Dr. Petrilli noted that on September 22, 2010, the creatinine level was still high, there was no improvement with oral intake, there was some shortness of breath, the patient was anemic, large doses of Lasix were given to drive urine output, and there was no bowel movement. Dr. Petrilli also noted that there was a notation of "N/V," meaning nausea/vomiting, but he acknowledged that this was the only reference to either nausea or vomiting in the first two days and that nausea is not uncommon in the first couple of days after a patient undergoes this kind of surgery; he also acknowledged that a corresponding box for vomiting was not checked even tough nausea was, and that there is no other indication in the records of vomiting up to that point.

{¶44} Dr. Petrilli noted that on September 23, 2010, urine output had increased but there was still no bowel movement, shortness of breath and anemia remained, the creatinine level had come down some but was still elevated, there was firmness in the abdomen and abdominal pain, and there was greater drainage from the vacuum that had been placed over the wound. It is not common, Dr. Petrilli stated, for patients to go this long without bowel function returning. Dr. Petrilli also stated that the report from the CT scan that was performed later that day revealed that the surgical closure of the fascia had dehisced such that the small bowel protruded out of the abdominal cavity and through the abdominal wall and was only held in the body by the skin and staples, and he opined that this protrusion was the firmness in the abdomen that had been noted earlier in the day. In Dr. Petrilli's opinion, the radiologist who wrote the CT report erred in concluding that the film depicted a hernia, although Dr. Petrilli admitted that he had not seen the CT film himself. According to Dr. Petrilli, a hernia takes time to develop and is distinguishable from what happened in this case, which he termed as purely a

wound dehiscence. While he testified that a post-operative hernia is not uncommon and is not a surgical emergency, in the case of a wound dehiscence such as this one the bowel needs to be immediately returned to its original location surgically. By Dr. Petrilli's explanation, when a bowel protrudes in this manner, there is a risk that pressure upon segments of it can cause loss of blood supply and ultimately necrosis, apparently whether or not the bowel becomes incarcerated. According to Dr. Petrilli, once the CT report was issued, there was a surgical emergency and it was a violation of the standard of care for the treating doctors to not recognize this and to not operate on Mrs. Becerra. Instead, Dr. Petrilli stated, the doctors treated this as merely a hernia to be dealt with at a later date. Dr. Petrilli also seemed to criticize the CT report for suggesting that there was a postoperative ileus, as he testified that a postoperative ileus normally resolves within a day or two of surgery.

{¶45} Dr. Petrilli testified that on September 24, 2010, there was still no bowel movement, there was abdominal pain, the firmness remained in the right side of the abdomen, and there was increased output in the wound vacuum, and he was critical of the fact that the vacuum output was not investigated. Dr. Petrilli testified that in the evening some confusion and lethargy were noted, and a mental status change like this was a significant finding and required the physicians to determine what was causing it. As Dr. Petrilli explained, hypoxia is a common cause, but after oxygen was administered without any positive effect, hypoxia was ruled out. Dr. Petrilli testified that sepsis is another potential cause of mental status changes and it should have been considered as a differential diagnosis, but there were no cultures taken to test for sepsis, and in Dr. Petrilli's opinion it was a breach of the standard of care to not attempt to rule out sepsis at that time. In Dr. Petrilli's opinion, Mrs. Becerra came to have sepsis at some point, but she did not begin to show signs of it until September 24, 2010, including the confusion and an elevated white blood cell count, and even then her vital signs were mostly normal and he does not believe she was actually in septic shock yet

at that time; indeed, he admitted that throughout the post-operative course, until the episode of aspiration and cardiac arrest, Mrs. Becerra never had some of the most common signs of sepsis, as she maintained a normal temperature, blood pressure, and heart rate. Although Dr. Petrilli was of the opinion that the bowel was becoming necrotic at that time, he acknowledged that a lactate test came back as normal, even though an elevated lactate level is a sign of tissue death, but he stated that lactate levels can be affected by many things and he called the test "irrelevant."

{¶46} As Dr. Petrilli stated, the working diagnosis at that time was instead hepatic encephalopathy, but in his opinion the medical records did not point toward that as a likely diagnosis. Indeed, Dr. Petrilli testified that in his opinion there is no evidence that Mrs. Becerra had a clinically significant liver impairment. Dr. Petrilli explained that Mrs. Becerra's enzyme levels were not elevated as one would expect to see in a patient with liver disease. While acknowledging that Mrs. Becerra's ammonia level was elevated and that an elevated ammonia level is one sign of liver disease, he testified that ammonia levels can rise from several different factors other than liver disease, and he opined that Mrs. Becerra's ammonia level was not high enough to cause mental status changes. He also acknowledged that a low albumin level is another sign of liver disease and that Mrs. Becerra's level was below normal, but he stated that albumin too is not necessarily an indication of liver disease. Dr. Petrilli testified that elevated bilirubin is another indicator of liver disease, but that Mrs. Becerra did not have significantly elevated bilirubin, and when it was elevated it was probably due to her receiving blood transfusions. As Dr. Petrilli admitted, the autopsy included a diagnosis of cirrhosis, and while he testified that he does not necessarily disagree with that diagnosis, he testified that it must have been mild and he observed that there is some inconsistency in that the earlier liver biopsy had not resulted in that diagnosis, and, moreover, in his opinion Mrs. Becerra simply did not show signs of liver failure during her post-operative course. Although Dr. Petrilli initially testified that he saw no evidence

of liver abnormality, he later allowed that the liver was not functioning perfectly, but in his opinion it is just not clear to what extent, and he is not of the opinion that liver failure had a causal relationship with the death.

{¶47} Dr. Petrilli testified that even though Mrs. Becerra was administered lactulose to reduce her ammonia level, on September 25, 2010, she still was confused, which he sees as evidence that she did not have significant liver disease. Dr. Petrilli also noted that even though an enema had been administered, there still was no bowel movement by that date. Dr. Petrilli stated that it was significant that the output from the wound vacuum dramatically increased, and that the doctors' first priority at that time should have been to rule out any leakage of bowel matter or disruption in the abdominal wall, but this did not happen.

{¶48} In Dr. Petrilli's opinion, when Mrs. Becerra initially vomited on September 25, 2010, and Dr. Lutz ordered the abdominal x-ray, it was essential that a nasogastric tube be placed at that time, and it was a deviation from the standard of care to not do so. Indeed, Dr. Petrilli opined that the failure to place a nasogastric tube at that time caused her death. As Dr. Petrilli explained, whereas Mrs. Becerra, in the absence of a nasogastric tube, vomited again in the x-ray room and aspirated the emesis, leading to cardiac arrest and brain death, in his opinion a nasogastric tube would have prevented that sequence of events. But, Dr. Petrilli testified that it is nevertheless probable that Mrs. Becerra had a necrotic bowel and sepsis by then and it is unknown whether she could have survived another surgery to address those issues. Dr. Petrilli also testified that the coffee ground nature of the emesis is consistent with there being a bowel obstruction.

{¶49} Dr. Petrilli testified that after being resuscitated and sent to the ICU, Mrs. Becerra had multiple organ failure, brain death was indicated by her fixed and dilated pupils and lack of gag reflex, and there was no chance of recovery. In Dr. Petrilli's view, it was thus pointless for Dr. Geisler to perform the second surgery, on September 26,

2010. Dr. Petrilli stated that when Dr. Geisler performed that operation, though, he found segments of necrotic bowel consistent with what happens when there is pressure placed on the bowel, such as from being pressed against the edges of the abdominal wall, although Dr. Petrilli did not testify that this was an incarceration or strangulation. The entire bowel deteriorated further afterward, Dr. Petrilli admitted, to the point that it was effectively dead, but he stated that Mrs. Becerra had multi-system organ failure in the ICU and in his opinion was in septic shock, and that this further deterioration of the bowel was consistent with those conditions. Dr. Petrilli also admitted, however, that even though fever is a sign of septic shock, Mrs. Becerra did not have a fever at the time when he believes she was in septic shock.

{¶50} According to Dr. Petrilli, the probable cause of Mrs. Becerra's death the following day, on September 27, 2010, is that the dehiscence of the fascial wound had put pressure on the bowel which caused it to turn ischemic, obstructed, and ultimately necrotic, and this in turn led to the episode of vomiting that resulted in the aspiration and cardiac arrest on September 25, 2010. Dr. Petrilli's essential criticism centers on the failure to surgically intervene on September 23, 2010, in light of the CT results and symptoms including the firmness in the abdomen, and in his opinion surgery at that time would have prevented the chain of events that resulted in Mrs. Becerra's demise. Dr. Petrilli, on cross-examination, testified at first that there was an "evisceration" by that date, but eventually corrected himself and explained that there was not an evisceration but instead the bowel was protruding through the dehiscence of the fascial wall. Dr. Petrilli's opinion was that the bowel was not necessarily strangulated or incarcerated in the opening, but nonetheless it required emergency surgical intervention because of the potential for the bowel to become obstructed or ischemic. Dr. Petrilli testified that Mrs. Becerra became increasingly ill after that time and probably developed a complete bowel obstruction by September 25, 2010, the date of the aspiration and cardiac arrest.

{¶51} Defendant's expert, Jeffrey M. Fowler, M.D., is a physician with board-certification in obstetrics and gynecology, and in the sub-specialty of gynecologic oncology, and he is currently licensed to practice medicine in the states of Ohio and Minnesota. Dr. Fowler, who graduated from medical school in 1985, serves as a Professor of Gynecologic Oncology at the Ohio State University Medical Center, where he is also both Vice Chair of the Department of Obstetrics and Gynecology and the Medical Director for the Center for Advanced Robotic Surgery. Dr. Fowler is the current president of the national Society of Gynecologic Oncology, and from 2009 to 2015 he served as a board member for the American Board of Obstetrics and Gynecology. Dr. Fowler testified that he performs between five and ten operations per week, requiring two to four days per week in the operating room, and he also devotes one full day a week to seeing patients in his office.

{¶52} In Dr. Fowler's opinion, the standard of care was met at all times with respect to Mrs. Becerra's care, beginning with the recommendation of the hysterectomy, as it is the most effective treatment for complex atypical hyperplasia, which carries more than a 40% chance of cancer. According to Dr. Fowler, alternative forms of treatment, such as progestin or radiation, would generally only be offered if surgery was not an option or the patient was a younger woman wanting to maintain fertility.

{¶53} Regarding the September 20, 2010 operation, Dr. Fowler had no criticism with the manner in which Dr. Geisler addressed the ventral hernia, including his decision to remove the existing mesh and not replace it, which Dr. Fowler said is the most common practice. Dr. Geisler's removal of lymph nodes during the operation was also within the standard of care, Dr. Fowler opined, noting that there is some disagreement among experts on this topic, but that the trend in the six years since the surgery occurred has been to not remove lymph nodes. Dr. Fowler also opined that it was appropriate for Dr. Geisler to biopsy the liver, based upon the sclerotic condition that was observed.

{¶54} Post-operatively, Dr. Fowler testified that it is common for a patient who has undergone this type of surgery to experience a lack of bowel function and to feel nauseated.  Dr. Fowler also testified that it was within the standard of care for Dr. Geisler to manage the post-operative acute tubular necrosis himself without ordering a nephrology consult, as this is up to the provider's discretion based upon the circumstances.  Dr. Fowler stated that when the red firmness was observed on the right side of the abdomen on September 23, 2010, it was appropriate to order a CT scan to determine what was causing it, which was consequently revealed to be loops of bowel in a large ventral hernia, meaning that the hernia repair performed by Dr. Geisler had failed.  As Dr. Fowler related, if the closure of the wound through the fascia dehisces, it will lead to a hernia as the fascial tissue spreads apart and the abdominal contents protrude out through the path of least resistance.  Dr. Fowler allowed that a hernia is a risk factor for a small bowel obstruction, but he stated that so long as the incision site in the skin has not been eviscerated and the bowel seems contained in the abdomen and there are no other findings to indicate surgery, then the appropriate course of action is to observe the patient and wait to repair the hernia at a later date.  In this case, Dr. Fowler pointed out, the skin remained intact and there was a wound vacuum placed over the incision site.  Dr. Fowler explained that so long as the bowel's blood supply is not strangulated or the bowel's viability is not otherwise jeopardized, surgical intervention is not necessary.

{¶55} In Dr. Fowler's opinion, there was no clinical indication on that date, before or after the CT scan, that a surgical emergency existed.  Dr. Fowler explained that Mrs. Becerra's temperature was normal, she did not have severe abdominal pain, she was not tachycardic, she did not have a high respiratory rate, her white blood cell count was decreasing, her elevated creatinine level was diminishing, and the CT scan was not consistent with either strangulation of the bowel or a bowel obstruction.  Dr. Fowler also

explained why an elevated lactate level in particular is an indicator for infected or ischemic tissue, but that Mrs. Becerra's lactate level was normal.

{¶56} On September 24, 2010, there was still no indication to operate on Mrs. Becerra, according to Dr. Fowler, citing the absence of tachycardia and hypertension, the normal respiration and oxygen saturation, a normalizing white count, continued reduction in the creatinine level, and increasing urine output.  The lack of a bowel movement at this point is not out of the ordinary, and most indicative of an ileus, which would be treated through close observation and fluid support, and possibly nutritional support, Dr. Fowler stated.

{¶57} As Dr. Fowler testified, surgery was still not indicated on the evening of September 24, 2010, when a resident examined Mrs. Becerra in response to symptoms of confusion and lethargy.  Dr. Fowler explained that Mrs. Becerra's vital signs were stable and still not pointing toward any infectious process, and a blood gas test showed that her pH level was normal, which was a strong indication of normal tissue perfusion. According to Dr. Fowler, the etiology of confusion in a post-operative patient can be quite difficult to determine.  Dr. Fowler testified that confusion is common post-operatively, and while an infectious process is certainly a risk to be aware of after a surgery like this, there are other potential causes as well, and sometimes there is simply a "sundowning" effect where the patient is just disoriented by the whole experience. Dr. Fowler stated that Mrs. Becerra's confusion was essentially the only indication of potential sepsis, and confusion is just one of many potential signs of sepsis, and he explained how her white blood cell count, lack of fever, and her heart rate, among other vital signs, tended to show that there was no infection.  Due to the lack of signs of sepsis, Dr. Fowler stated, the standard of care did not require that cultures be taken. Rather, Dr. Fowler stated that Mrs. Becerra's clinical picture was more indicative of hepatic encephalopathy, where mental status changes result from the liver failing to metabolize ammonia and other toxins in the blood, and the elevated ammonia level

here was consistent with that process. Dr. Fowler testified that the appropriate treatment, including administering lactulose, was rendered in response to the elevated ammonia level.

{¶58} According to Dr. Fowler, when Mrs. Becerra initially vomited on September 25, 2010, the administration of Zofran and ordering a stat x-ray were appropriate, and he also stated that while it would not have been inappropriate to place a nasogastric tube at that time, it was not required, adding that placement of the tube is more standard when the vomiting is persistent. In any event, Dr. Fowler stated, if a nasogastric tube had been placed, it would have been clamped off while the x-rays were being taken. Regarding the coffee ground nature of the emesis, Dr. Fowler testified that this can be associated with blood in the emesis but not necessarily, and there are multiple potential causes for that, with a bowel obstruction being one, but others include irritation in the stomach or an ulcer. In Dr. Fowler's opinion, however, the medical evidence does not demonstrate that Mrs. Becerra had a bowel obstruction. Dr. Fowler was cross-examined about the ongoing complaints of pain that were documented throughout the post-operative course, and he acknowledged that this is a potential symptom of a bowel obstruction, but he explained that this is also a potential symptom of an ileus and, furthermore, it is simply a general complaint common to any major abdominal surgery. As Dr. Fowler stated, abdominal pain is one of several symptoms that are associated with a bowel obstruction and also with an ileus, but the ileus is much more common post-operatively and typically resolves on its own. As Dr. Fowler stated, the x-ray taken September 25, 2010, produced findings consistent with an ileus. Indeed, Dr. Fowler's opinion was that Mrs. Becerra never had a bowel obstruction.

{¶59} In Dr. Fowler's opinion, however, Mrs. Becerra did have cirrhosis, as was diagnosed in the autopsy report, and it was a significant component in the sequence of events culminating in her death. In Dr. Fowler's opinion, it is not a discrepancy that the

biopsy taken by Dr. Geisler did not result in a diagnosis of cirrhosis, for the pathologist performing the autopsy could examine the entire liver to make that diagnosis rather than the small sample that was examined from the biopsy. Dr. Fowler testified that cirrhosis results from hepatitis, or inflammation to the liver tissue, which produces the visually scarred or sclerotic appearance that Dr. Geisler documented during the initial surgery. As Dr. Fowler testified, the liver processes blood and waste from the bowel, and when the liver is cirrhotic it makes the patient fragile in that the body may not be able to handle the shock of surgery, so there is a high risk of death. A patient known to have cirrhosis generally will require a consultation with a liver specialist to assess the risk of surgery, Dr. Fowler testified, but here it was not known beforehand that Mrs. Becerra had cirrhosis. Dr. Fowler also testified that liver function is not something that is routinely tested before a surgery, and patients with cirrhosis may lack any obvious symptoms, thus he has no criticism for the fact that the liver function was not tested before this surgery. Although Dr. Petrilli placed much significance on Mrs. Becerra's post-operative liver enzyme levels to downplay the degree to which her liver was compromised, Dr. Fowler explained how liver enzymes are created and how the enzyme levels can remain normal even in a patient with cirrhosis, and that enzyme levels are just one sign to look at relative to liver function. Dr. Fowler also explained the significance of other indicators and how they fit in this particular case, including deficient blood clotting, mildly elevated bilirubin levels, and low albumin levels.

{¶60} According to Dr. Fowler, after a major insult to the body such as abdominal surgery, the liver of a cirrhosis patient is stressed and its function is oftentimes compromised to the point that it compromises other organs. Dr. Fowler described the high risk of death associated with a cirrhosis patient undergoing surgery and how it can lead to a rapid decline of multiple organs, and he explained that while certain complications from a failing liver can be medically treated, the liver itself cannot. In the case of Mrs. Becerra, Dr. Fowler testified that the surgery alone made her susceptible to

liver failure, and this was compounded by the blood loss and hypotension during surgery, and indeed she showed signs of liver failure post-operatively. Dr. Fowler described how the signs of liver failure escalated, with an elevated ammonia level and the onset of confusion consistent with hepatic encephalopathy. Dr. Fowler also related that the liver was put under significantly more stress when Mrs. Becerra aspirated her emesis and went into cardiac arrest. In Dr. Fowler's opinion, after that episode, Mrs. Becerra experienced rapid, multiple organ failure, despite the ventilator and other support provided in the ICU, and her body shut down.

{¶61} By Dr. Fowler's testimony, the bowel was one of the organs that failed and contributed in significant part to the death, but his opinion, based largely upon the autopsy, was that the bowel as a whole did not get sufficient blood flow and underwent failure, not a small portion like one would see with a strangulated bowel. To that end, Dr. Fowler also pointed to the fact that when Dr. Geisler performed the second surgery and removed segments of necrotic bowel (3 to 4 feet total according to pathology), he found poor pulses throughout the entire bowel, demonstrating the poor delivery of blood. Additionally, when questioned about the appropriateness of that surgery, Dr. Fowler acknowledged that Mrs. Becerra's prognosis was clearly poor at that point, but he testified that the exact extent of brain damage was not certain and that the surgery was not going to make the prognosis any worse. Dr. Fowler also testified that the exudate noted in the pathology discussion of the bowel is consistent with the fact that the entire bowel was dying and that the exudate could account for the increase in the output from the wound vacuum. Dr. Fowler also opined that even though pathology noted a flattening of the cecal mucosa, there are commonly gross changes to the bowel when it is dying and it is difficult to assign any significance to this description.

{¶62} It was acknowledged by Dr. Fowler that the death summary does not refer to the liver other than mentioning the liver biopsy, but he noted that the death summary was dictated by Dr. Lutz and, while he feels that it is not as comprehensive as it should

be, it was a complicated body of work for a second year resident.  Still, Dr. Fowler allowed that Dr. Geisler did sign off on the death summary.

{¶63} Plaintiff's claim for wrongful death is based upon a theory of medical malpractice.  "In order to establish medical malpractice, a plaintiff must show: (1) the standard of care recognized by the medical community, (2) the failure of the defendant to meet the requisite standard of care, and (3) a direct causal connection between the medically negligent act and the injury sustained."  *Tobin v. Univ. Hosp. E.*, 10th Dist. Franklin No. 15AP-153, 2015-Ohio-3903, ¶ 14, citing *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. Franklin No. 12AP-999, 2013-Ohio-5140, ¶ 19.  "Expert testimony is required to establish the standard of care and to demonstrate the defendant's alleged failure to conform to that standard."  *Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487, ¶ 38 (10th Dist.), citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130-131 (1976).  The Supreme Court of Ohio established the legal standard for medical malpractice in *Bruni*:

{¶64} "In evaluating the conduct of a physician and surgeon charged with malpractice, the test is whether the physician, in the performance of his service, either did some particular thing or things that physicians and surgeons, in that medical community, of ordinary skill, care and diligence would not have done under the same or similar circumstances, or failed or omitted to do some particular thing or things which physicians and surgeons of ordinary skill, care and diligence would have done under the same or similar circumstances. He is required to exercise the average degree of skill, care and diligence exercised by members of the same medical specialty community in similar situations."  *Id.* at 129-130.

{¶65} Upon review of the evidence presented at trial, the magistrate finds as follows.  Mrs. Becerra was referred to Dr. Geisler based upon her post-menopausal bleeding and complex hyperplasia with atypia.  Dr. Geisler met with Mrs. Becerra and developed a plan of care that entailed a bilateral salpingo-oophorectomy, which was within the standard of care.  The surgery was performed on September 20, 2010.  Dr.

Geisler, while performing the surgery, observed that the liver was sclerotic and consequently took a biopsy which resulted in a pathology diagnosis of hepatitis. There was significant bleeding during the surgery consistent with the clotting deficiency associated with liver disease. Prior to the surgery, and without any negligence on the part of defendant, it had not been known that Mrs. Becerra's liver was diseased. But, as was confirmed in the autopsy, when the entire liver could be examined rather than a small biopsy sample, Mrs. Becerra had cirrhosis of the liver. The impaired liver function in patients with cirrhosis makes it more difficult to recover from a surgery like this one, and the risk of mortality is heightened, this on top of the patient's comorbidities.

{¶66} Due to the amount of bleeding during surgery associated with the liver disease, Mrs. Becerra experienced acute tubular necrosis, impairing her kidney function post-operatively, and Dr. Geisler's management of that condition complied with the standard of care. Mrs. Becerra's post-operative course was relatively normal during the first two days after the surgery, September 21 and 22, 2010. On the third day after the surgery, September 23, 2010, a firm mass was identified in the lower right quadrant of the abdomen. A lactate sample taken that morning was normal, tending to show that there was no necrosis of the bowel at that time. Subsequent blood gas tests, particularly the pH level, were normal as well, strongly indicating that there was no necrosis, nor reason to repeat the lactate tests.

{¶67} The CT scan taken on the afternoon of September 23, 2010, indicated that Mrs. Becerra had an ileus and large ventral hernia. The CT scan did not indicate that Mrs. Becerra had a bowel obstruction, and indeed the radiologist's report specifically noted that the scan did not show a definite obstruction or incarceration. Dr. Petrilli's contention that the CT scan was erroneously interpreted is not persuasive, considering that the radiologist and Dr. Manahan each drew the same conclusions when they reviewed the film, which Dr. Petrilli never looked at himself. Dr. Petrilli gave confusing testimony, including erroneous terminology, about the hernia, at multiple times testifying

there had been an evisceration when clearly there was not. His central opinion, that there was a surgical emergency in light of the CT results on September 23, 2010, was somewhat conclusory and confusing, and it was substantially outweighed by Dr. Fowler's explanation why surgical intervention was not indicated. In the absence of a bowel obstruction, or the bowel getting incarcerated and strangulated in the hernia, another surgery was not indicated from the mere fact that the fascia dehisced and the hernia re-opened. The decision not to operate at that point complied with the standard of care. On causation as well, the evidence does not substantiate Dr. Petrilli's theory that the hernia led to ischemia or an obstruction which in turn caused the cardiac arrest.

{¶68} The signs at the time of the CT scan, and indeed throughout the remainder of the post-operative course in this case did not indicate the presence of a bowel obstruction, nor a strangulation of the bowel. Significantly, when x-rays were performed just before Mrs. Becerra went into cardiac arrest on September 25, 2010, the imaging was not found to be consistent with strangulation or any ischemic process, rather, it was found that Mrs. Becerra likely had an ileus. Even when Dr. Geisler performed the operation on September 26, 2010, he did not see evidence of strangulation, and indeed both Dr. Geisler's observation of poor pulses during that surgery and the autopsy results show that tissue perfusion was failing throughout the entire bowel.

{¶69} While Dr. Petrilli attributed Mrs. Becerra's post-operative confusion to sepsis resulting from bowel necrosis, it was not established that Mrs. Becerra ever had sepsis, her confusion was consistent with hepatic encephalopathy, and it was within the standard of care to suspect that the confusion was caused by poor liver function. Unbeknownst to anyone before the surgery, Mrs. Becerra had cirrhosis of the liver, and, as a result, her ability to recover from this major abdominal surgery was significantly compromised. Dr. Petrilli downplayed the significance of her liver disease, emphasizing that her liver enzymes were normal post-operatively, but he admitted that a patient with liver disease can have normal enzymes. Mrs. Becerra's bleeding during the surgery,

her albumin and bilirubin levels, her elevated ammonia level, the sclerotic appearance of her liver as observed by Dr. Geisler, and the diagnosis of cirrhosis during the autopsy all support Dr. Fowler's opinion that the liver was compromised and, in light of the relationship between the liver and the body's other organ systems, that it played a role in the sequence of events leading to her demise.

{¶70} Among those events were the vomiting, aspiration, and cardiac arrest on September 25, 2010. While Dr. Petrilli opined that it violated the standard of care not to place a nasogastric tube immediately after the first instance of vomiting and that this was causative of Mrs. Becerra's death, Dr. Fowler testified that it was not necessary to do so. Moreover, any such tube would have been clamped off in order to take the x-rays that were appropriately ordered at that time and aspiration could still have occurred. And, even if the standard of care had been violated by not immediately placing a nasogastric tube, one can only speculate about the chance for survival at that point. Although the testimony of Rosa Estrada and Amanda Becerra established that the x-ray technicians were slow to act when the vomiting recurred in the x-ray room, there was no expert testimony to establish a causal relationship between their acts or omissions and Mrs. Becerra's death.

{¶71} The vomiting that occurred in the x-ray room was aspirated and led to cardiac arrest which lasted 15 to 20 minutes. The cardiac arrest caused catastrophic damage due to the lack of blood flow to the various organs, including the bowel, and multiple organ failure ensued. Consistent with that, Dr. Geisler detected only a faint pulse in the parts of the bowel that he did not remove during the September 26, 2010 surgery. And, while there were necrotic segments at that time, Dr. Fowler explained how different segments of the bowel may die at different rates, but at any rate the entire bowel here was dying.

{¶72} Regarding the September 26, 2010 surgery, Dr. Petrilli was critical of the fact that it occurred at all, given that Mrs. Becerra's pupils were known to be fixed and

dilated at that time, indicating probable brain death.  However, Dr. Geisler was the attending physician and when he returned to the hospital it was only a matter of hours after the cardiac arrest occurred, it was not known at that point whether in fact Mrs. Becerra was brain dead, and Dr. Geisler wanted to do whatever he could to determine what was causing Mrs. Becerra's decline and try to help.  The family also wanted Dr. Geisler to operate, and indeed even later, once the likelihood of brain death was better understood, family members wanted Dr. Geisler to operate a third time and insisted on getting other opinions when he refused.  While it may have been possible for Dr. Geisler to more effectively communicate to the family the grave nature of Mrs. Becerra's condition before the September 26, 2010 surgery, it is undisputed that the second surgery has no causal relationship to Mrs. Becerra's death.

{¶73} The profound harm that Mrs. Becerra's death brought upon her large, close-knit family cannot be overstated and the magistrate sympathizes with their loss.  It should be said that the family's grief was compounded by certain factors which, though they did not affect the outcome in this case, were nevertheless unfortunate, such as the apparent insensitivity of the x-ray technicians or the words Dr. Geisler had with Mr. Becerra on the night of September 26, 2010.  It is also noted that there were some errors or deficiencies in the medical records, but these too had no bearing on the ultimate outcome in this case.

{¶74} The central inquiry in this case is whether the care and treatment rendered by defendant's medical professionals leading up to the cardiac arrest on September 25, 2010, complied with the standard of care.  On that issue, and indeed overall, Dr. Fowler's testimony was better explained, had more support within the medical evidence, and was decidedly more persuasive than Dr. Petrilli's testimony.  At least at the time of his deposition, Dr. Petrilli grossly misunderstood the meaning of a standard of care within the medical community.  Dr. Petrilli also spends far less time in the active clinical practice of medicine than Dr. Fowler, a national leader in the field of gynecologic

oncology. Indeed, the decision whether to allow Dr. Petrilli to testify as an expert in this case was a fairly close one. Dr. Petrilli's testimony wandered off topic repeatedly and he went out of his way to render an array of criticisms, many of which had no bearing on the outcome. Dr. Petrilli's opinions were lacking in clarity and somewhat difficult overall to understand, and while plaintiff's counsel laid out a more comprehensive and methodical approach in his closing argument, Dr. Petrilli did not substantiate or even touch upon some of those arguments. The burden of proof in this case requires expert testimony to demonstrate that a breach in the standard of care proximately caused Mrs. Becerra's death, but Dr. Petrilli's testimony on those matters was clearly outweighed by Dr. Fowler's. In sum, at all times relevant, the diagnosis, care and treatment rendered by defendant's medical professionals complied with the standard of care.

{¶75} Based on the foregoing, the magistrate finds that plaintiff did not prove her claim by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶76} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
ROBERT VAN SCHOYCK
Magistrate

cc:

R. Ethan Davis
Zachary J. Murry
1701 Woodlands Drive, Suite 100
Maumee, Ohio 43537-4092

Anne Berry Strait
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

**Filed January 26, 2017**
**Sent to S.C. Reporter 3/7/17**